Jeffery Lee GRIFFIN,
Petitioner-Appellant,

v.

James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent-Appellee.

No. 86–2781.

United States Court of Appeals,
Fifth Circuit.

July 28, 1987.
Rehearing and Rehearing En Banc
Denied Sept. 10, 1987.

Stanley G. Schneider, Tom Moran, Houston, Tex., for petitioner-appellant.

Charles A. Palmer, Asst. Atty. Gen., Jim Mattox, Atty. Gen., Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before GEE, RUBIN and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

The primary question presented in this habeas corpus death case is whether, under *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Jeffery Lee Griffin's confession was improperly admitted against him in the Texas state trial court, because, as he contends, the police did not permanently refrain from interrogating him after he stated, "I think I want to talk to my lawyer." We hold that the petitioner's statement was an unambiguous limited request and cannot be interpreted as an invocation of his general right to counsel; thus, because the police fully honored Griffin's request to speak to his counsel, the question whether Griffin waived an invoked right to counsel, under *Edwards v. Arizona,* is not raised in this case. Consequently, Griffin's confession was properly

admitted, and we deny his request for habeas relief.[1]

## I

On Monday, March 12, 1979, at about 11:45 p.m., Griffin informed Frank Chapa, a friend of Griffin, that Daniel Sobotik, the manager of the convenience store where Chapa worked, had been kidnapped. According to the statement Griffin gave to the police that night, he saw Sobotik and Horatio DeLeon, a seven-year part-time employee of the store, leaving with two men; when Griffin spoke to Sobotik, the men hit Sobotik, fired shots at Griffin and drove away in Sobotik's car with Sobotik and DeLeon. Sobotik's car was found at 7 a.m. on March 13, 1979; inside the car were the bodies of Sobotik and DeLeon.

Later in the day of March 13, Griffin arrived at the police station and repeated the statement he had given the night before. At that time he agreed to take a polygraph examination. The test indicated deception, and Griffin was arrested at 1:15 p.m. and taken before a magistrate who advised him of his constitutional rights. Griffin did not request an attorney at this time. At trial, Officer Doug Bostock described what happened next:

A. He was returned to the interview room in the Homicide Division, and we again went over his legal rights to make sure he understood them, sir.

[Q.] How did you do that? Did you take the warnings from a card? Did you taken them from a confession form?

A. We used the same warning the magistrate did, sir, and went over each point.

. . . .

1. On appeal, Griffin raises eight issues: (1) that the admission into evidence of his confession violated the Supreme Court's holding in *Edwards v. Arizona;* (2) that comments made by the prosecutor in closing arguments denied his right to a fair and impartial trial guaranteed by the fourteenth amendment; (3) that venireman Jackson was excluded in violation of *Witherspoon v. Illinois;* (4) that the oath required of each juror violated his right to due process; (5) that the use of testimony regarding psychological examinations taken without adequate warn-

ings to Griffin violated his fifth and sixth amendment rights; (6) that he received ineffective assistance of counsel; (7) that the trial court's refusal to define certain terms of the special interrogatories violated his constitutional rights; and (8) that introduction of evidence of extraneous offenses without notice violated his right of due process. The *Edwards* issue is the only substantial question raised and we briefly dispose of the remaining issues at the conclusion of this opinion.

Q. Did you question him as to whether or not he understood what each one of these rights meant[?]

A. Yes, sir, we did.

Q. Did you tell him that he had a right to employ a lawyer, as reflected in there?

A. We did, sir, and he said he had a lawyer.

Q. Did you ask him whether or not he knew he had a right to remain silent?

A. Yes, sir, we did.

Q. Did he understand that?

A. Yes, sir, he did.

Q. Did you tell him that he had a right to have a court appointed lawyer, if he couldn't afford a lawyer?

A. Yes, sir, we did.

Q. Did he understand that concept?

A. Yes, sir, he replied he had a lawyer.

Q. He didn't want a court appointed lawyer, as far as you could tell?

A. He didn't want any lawyer, sir.

Q. Did you tell him that if he elected not to remain silent, that what he said would be taken down and probably used against him?

A. Yes, sir, we did.

Q. Is that reflected on the warning that we are talking about?

A. Yes, sir.

Q. Did he say he understood that?

A. Yes, sir, he did.

Q. Did he say at that point and time that he wanted to talk to you?

A. We asked him if he wished to talk to us, after all of this, and he said: Yes, I'll talk to you.

Q. Did he talk to you freely and voluntarily?

A. Yes, sir, he did.

Q. How long did you talk to him while he was there in the interrogation room?

A. He talked to us until around 3:00 o'clock.

Q. So this would be from 2:00 o'clock to 3:00 o'clock?

A. Probably about 1:45 to about 3:00 o'clock, yes, sir.

Q. What were you talking about then? Were you talking about the previous statement or what?

A. We talked about the previous statement and some of his background, some of his way of life and so forth, where he lived, about the investigation itself, and then about 3:00 o'clock that afternoon, he looked at us and said: *I think I want to talk to my lawyer.*

Q. *What did you do then?*

A. *I asked him who his attorney was and he said it was Mr. Jennings.*

*I pulled out a telephone book, looked up the number, dialed the number, gave him the telephone.*

Q. Is that Tom Jennings?

A. I believe that's his first name, yes, sir.

Q. Is that the person you dialed, in any event?

A. *Yes, sir. I called his office at which time I gave Mr. Griffin the telephone, and Detective Schultz and I stepped out of the office.*

Q. *What happened then?*

A. *He talked on the telephone sir.* We didn't listen to the conversation. We left the door open where we could observe him, but we did not listen to the conversation.

Q. How long did the conversation take place?

A. Roughly between five and ten minutes, I believe, sir.

Q. This would have been sometime after 3:00 o'clock, between 3:00 o'clock—

A. It was right around 3:00 o'clock when he stated that he would like to talk to his lawyer, that he had better talk to his lawyer, and then, after he hung up, we returned in there, and he advised us that he had, in fact, talked to his attorney, and *about 3:30, his attorney called back and asked to talk to him.*

*Again, we put him on the telephone and we left the office.*

Q. Between 3:00 and 3:30, did you talk to him about the case?

A. We talked to Mr. Griffin mostly, I think, about what his attorney was advising him.

Q. Okay. Then, at 3:30, Mr. Tom Jennings again called the Homicide Office?

A. Well, Detective Schultz was advised that Mr. Jennings was on the telephone, and then Detective Schultz came back into the interview room and told Mr. Griffin that his attorney wanted to talk to him.

*We again left the interview room and allowed him to talk to Mr. Jennings on the telephone.*

Q. How long did that conversation take?

A. Just a short conversation, just a minute or two, I believe.

Q. *What happened after he hung up?*

A. *We re-entered the interview room and asked him what had happened, and he said Mr. Jennings had told him he was not going to represent him.*

Q. *Did you ask him then whether he wanted a lawyer?*

A. *Yes, sir. We asked him if he wanted to call another lawyer.*

Q. *What did he say?*

A. *He said: No. He just didn't want to talk to any lawyers right now.*

Q. Who was present when this was said?

A. Detective Schultz and I believe Detective Kent had come in by that time, and I don't recall if there was anybody else actually in the room then, sir.

Q. *But, in any event, he said he didn't want any lawyer?*

A. *He said he didn't want any other lawyer now.*

Q. Then what happened?

A. Detective Kent asked me if— When Detective Kent came into the room, he was behind me, and Mr. Griffin smiled at him.

Detective Kent asked me if I would have any objections if he interviewed him, and I stated: No, and I leaned over and told Detective Schultz that Detective Kent wished to interview him, and Detec-tive Schultz and I stepped out of the room, sir.

665 S.W.2d at 769.

Kent then advised Griffin of his *Miranda* rights again. After a few minutes of talking to Detective Kent, Griffin confessed to killing David Sobotik. In his confession, Griffin stated that he went to the convenience store at which Sobotik worked at about 9:40 p.m. When he arrived, Sobotik asked Griffin to return the money which Sobotik had paid to Griffin for a watch. Griffin left the store to wait for Sobotik to finish working. When Sobotik was ready to leave, he, Griffin and DeLeon got in Sobotik's car and headed toward Griffin's house. According to Griffin, during the ride, "something strange started happening ... I pulled my knife and started stabbing David." Griffin then started stabbing DeLeon. Griffin left the car screaming and went back to the store where he frightened customers away by shooting at them with a pistol.

Following this confession, Griffin directed the officers to the place where he had discarded the knife he used in the slaying.

Later that day, Griffin gave another statement to Detective Kent regarding the death of Sylvia Mendoza in July 1978. Griffin had been a suspect in that case which Kent investigated. Griffin stated that approximately nine months previously he had met a girl, Sylvia Mendoza, near a night club. She asked for directions and Griffin advised that she not walk alone at night. He offered his assistance and she started kissing him. Mendoza then climbed in a trash dumpster and removed her clothes. While she and Griffin were having sex, Griffin started stabbing her "a lot of times."

The next day Griffin altered his confession to make clear that he took the pistol from the store before he left with Sobotik and DeLeon.

## II

Griffin objected to the admission of his confession at trial. The objection was overruled, however, on the ground that the

confession was voluntary. On appeal, the Texas Court of Criminal Appeals rejected his argument that, based on *Edwards*, the confession was inadmissible because it resulted from police-initiated questioning after he had invoked his right to counsel. *Griffin v. State*, 665 S.W.2d 762 (Tex.Cr. App.1983). According to the Texas court, the *Edwards* rule requiring initiation of interrogation by the accused was not implicated because Griffin "did not make a general request for counsel as Edwards did"; rather Griffin asked only to speak to "his" attorney.[2] *Id.* at 769.

On federal petition for writ of habeas corpus, the district court also denied the relief requested. Like the state court, the district court concluded that *Edwards* was distinguishable. In *Edwards*, the defendant expressed a desire to deal only through counsel. Griffin, however, asked only to speak to *his* attorney; he never said to the police that he would talk only to an attorney. When Griffin's attorney refused to represent him, the questioning properly focused on clarifying Griffin's request for counsel. In response, Griffin stated he did not want to talk to an attorney at that time. The district court therefore concluded that Griffin waived his right to counsel.

### III

According to Griffin, this case is unequivocally controlled by *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). *Edwards*, he argues, clearly established that once a defendant invokes his right to counsel, further questioning by police officers may not take place unless (1) the defendant initiates the interrogation and (2) validly waives his right to counsel. Griffin asserts that for purposes of *Edwards* he invoked his general right to counsel by requesting to speak to his attorney. Because his confession resulted from interrogation thereafter initiated by the officers and not by Griffin, his confession should be suppressed.

The state, however, contends that *Edwards* is not applicable. Griffin asked only

to speak to *his* attorney, thereby invoking his right to counsel only in a limited manner, and not generally, as did the defendant in *Edwards*. This request was satisfied and furthermore, Griffin was given the opportunity to talk with another attorney. He declined to talk to another attorney and effectively waived his right to counsel. The state thus argues that *Edwards* does not prohibit admission of Griffin's confession.

### IV

This case turns on whether the *Edwards* holding is applicable to these facts. We therefore turn to a review of the facts that underlie the *Edwards* holding. Edwards was arrested for first-degree murder. The police station read his *Miranda* rights to him and he agreed to answer questions asked by the officers. At first he denied that he was involved and gave an alibi. In a short while, however, he told the officer that he wanted to "make a deal." The officer told Edwards that he was not authorized to negotiate a deal and gave Edwards the telephone number of a county attorney. Edwards began to call the attorney but stopped and said, "I want an attorney before making a deal." The officer then stopped questioning Edwards at that time, but the next morning two different officers went to Edwards' jail cell. Although Edwards then stated that he did not want to talk to anyone, the guard told him that "he had" to talk to the officers. When Edwards talked to the officers, he agreed to give a statement but only after listening to the recorded statement of his alleged accomplice. Edwards heard the other statement and then agreed to give his own statement so long as it was not tape recorded. He then confessed.

At trial Edwards objected to the introduction of his confession, but the trial court found it to be voluntary and admitted it into evidence. The Arizona Supreme Court affirmed on the ground that Ed-

---

**2.** One judge of the Texas court dissented on the ground that the majority opinion "cannot be squared with *Edwards v. Arizona*." *Id.* at 770 (Onion, J., dissenting).

wards waived his right to counsel by voluntarily giving his statement.

The Supreme Court reversed, holding that "an accused ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police" and validly waives his right to counsel. 451 U.S. at 484–85, 101 S.Ct. at 1884–85. This result, the Court stated, is consistent with *Miranda*'s recognition of the invocation of the right to counsel as a "significant event" after which " 'interrogation must cease until an attorney is present'." *Id.* at 485, 101 S.Ct. at 1885 (quoting *Miranda v. Arizona*, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966)). Because Edwards sufficiently invoked his right to counsel and because further questioning was initiated by the police and not by Edwards before he was allowed access to counsel, the confession was inadmissible. 451 U.S. at 486–87, 101 S.Ct. at 1886.

In trying to understand fully how *Edwards* should be interpreted and applied in new factual situations, we think it is important to draw attention to the police overreaching exhibited in that case. After Edwards stated, "I want an attorney before making a deal," the police took no steps toward honoring his request. Instead of terminating the interrogation until the request had been honored, the police came back to the jail the following morning for the purpose of further interrogating him. Edwards specifically stated that he did not wish to speak with them, but he was told he had no choice. Thus, Edwards' confession came only after he was denied an attorney and compelled to talk to the police. We think that it is clear that the motivating factor behind the *Edwards* rule is to protect against and to discourage police interference with the free exercise of the right to counsel. Indeed, there hardly could be any other raison d'etre for the holding.

That the primary purpose of the *Edwards* rule is to protect an accused from any possible overreaching or coercion on the part of the police is well illustrated by the Supreme Court's treatment of the rule in subsequent cases. The distinct propensity has been not to extend the *Edwards* rule to cases that do not demonstrate untoward conduct on the part of the police.

In *Wyrick v. Fields*, 459 U.S. 42, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), the defendant had retained private counsel. After talking with his attorney, the accused requested that the police administer a polygraph examination. He signed a statement that he understood his *Miranda* rights and did not want an attorney at that time. The polygraph examination proved unfavorable for Fields, and, upon police-initiated questions that followed, he confessed. He was taken before the police chief and again informed of his *Miranda* rights; he again confessed. The Eighth Circuit held that the confession was barred by *Edwards*, concluding that Fields had initiated only the polygraph examination, and at the conclusion of the polygraph the police should have refrained from further interrogation. The Supreme Court reversed and held that "by requesting a polygraph examination, [Fields] initiated interrogation" that led to the confession. The confession was held voluntary and admissible notwithstanding that the interrogation occurred in the absence of his attorney. The Court expressly stated that the Eighth Circuit's holding that the confession was inadmissible was an "unjustifiable restriction on *reasonable* police questioning." *Id.* 103 S.Ct. at 397 (emphasis added).

Similarly, in *Oregon v. Bradshaw*, 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983), the Court reversed the Oregon Supreme Court's exclusion of a confession made after the accused had requested an attorney. After he invoked his right to counsel, the accused had asked, "Well, what is going to happen to me now?" The officer answered by saying, "You do not have to talk to me. You have requested an attorney and I don't want you talking to me unless you desire because anything you say—because—since you have requested

an attorney you know it has to be of your own free will." *Id.* 103 S.Ct. at 2833. In the conversation that ensued, Bradshaw agreed to a police suggestion that he submit to a polygraph examination, which indicated his untruthfulness. He then confessed. In holding the confession admissible, the Court noted that *Edwards* was "in effect a prophylactic rule, designed to protect an accused in police custody from being badgered by police officers." *Id.* at 2834. In the absence of such conduct on the part of the police, and based on "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of [Bradshaw]," *id.* at 2835 (quoting *North Carolina v. Butler,* 441 U.S. 369, 374–75, 99 S.Ct. 1755, 1758, 60 L.Ed.2d 286 (1979)), the Court held that Bradshaw had waived his right to counsel.

On the other hand, in *Smith v. Illinois,* 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), where there was police overreaching, the Court reversed the Illinois Supreme Court that had determined that the accused had not effectively invoked his right to counsel. When first advised of his right to consult a lawyer, the accused had responded, "Uh, yeah. I'd like to do that." Instead of honoring the accused's request at that point, the police completed reading his *Miranda* rights to him and then "pressed him" again:

> Q. If you want a lawyer and you're unable to pay for one a lawyer will be appointed to represent you free of cost, do you understand that?
> A. Okay.
> Q. Do you wish to talk to me at this time without a lawyer being present?
> A. *Yeah and no, uh, I don't know what's what, really.*
> Q. *Well. You either have to talk to me this time without a lawyer being present* and if you do agree to talk with me without a lawyer being present you can stop at any time you want to.
> Q. All right. I'll talk to you then.

*Smith v. Illinois,* 105 S.Ct. at 492. Holding the confession that followed inadmissible, the Court concluded that the Illinois court erred in considering the accused's

remarks in total. The accused had clearly asserted his right to counsel at the initial stages of the questioning, and his subsequent statements were irrelevant in determining whether there had been an invocation of the right to counsel. Because his initial request was neither equivocal nor ambiguous, and because questioning had continued after the request for counsel had been made, the confession was inadmissible. The Court, however, emphasized that "[o]ur decision is a narrow one," deciding only that "an accused's post-request responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 495.

█ Although these cases are clearly indicative to us that in the absence of some police interference with the exercise of the right to counsel of the accused, the *Edwards* rule is to be strictly and narrowly applied, none of them specifically addressed the kind of case that is presented by the facts before us today. However, the Supreme Court's most recent pronouncement on the subject does. In *Connecticut v. Barrett,* ── U.S. ──, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987), the Supreme Court made clear that police officers are not required to interpret a limited request as an assertion of a general unlimited right to counsel and recognized that an unambiguous limited request for counsel is to be construed according to its plain meaning.

Barrett, after being advised of his *Miranda* rights, stated that he would "not give a written statement unless his attorney was present but had 'no problem' talking about the incident." *Id.* 107 S.Ct. at 830. Police interrogation followed and Barrett orally confessed. The Connecticut Supreme Court held that Barrett had invoked the right to counsel by refusing to give a written statement without his attorney's presence, and that under the *Edwards* rule, the police were then barred from further interrogation. In giving Barrett's request the broadest meaning, the Connecticut court stated:

> No particular form of words has ever been required to trigger an individual's

fifth amendment protection; nor have requests for counsel been narrowly construed. The defendant's refusal to give a written statement without his attorney present was a clear request for the assistance of counsel to protect his rights in his dealings with the police. Such a request continues to be constitutionally effective despite the defendant's willingness to make oral statements. We conclude, therefore, that the defendant did invoke his right to counsel under the fifth and fourteenth amendments.

*Id.* at 831 (quoting *Connecticut v. Barrett,* 197 Conn. 50, 57, 495 A.2d 1044, 1049 (1985) (citations omitted)).

■ This reasoning, giving broad meaning to limited requests for counsel, was rejected by the Supreme Court. The Court recognized that an accused may invoke a limited right to counsel. In this respect, Barrett had invoked his right to counsel only with respect to written statements; he had not asked for counsel to be present when he gave an oral statement. Since his request for counsel was limited to written statements, the Court held that the police officers were required to honor his request only to that extent. The Court explained:

> Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous. Here, however, Barrett made clear his intentions, and they were honored by police. To conclude that respondent invoked his right to counsel for all purposes requires not a broad interpretation of an ambiguous statement, but a disregard of the ordinary meaning of respondent's statement.

*Id.* 107 S.Ct. at 832.[3]

Additionally, Justice Rehnquist noted that *Edwards* was only a prophylactic rule

that served as an "auxiliary barrier against police coercion." 107 S.Ct. at 832. *Edwards,* Justice Rehnquist explained, is designed to further the purpose of *Miranda* which is "to assure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process." *Id.* at 831 (quoting *Miranda v. Arizona,* 384 U.S. 436, 469, 86 S.Ct. 1602, 1625, 16 L.Ed.2d 694 (1966)). Thus, in the absence of police overreaching, the Court found "no constitutional objective that would be served by suppression in this case." 107 S.Ct. at 832.

■ In our view, a case could hardly be more applicable to our facts than *Barrett.* As in *Barrett,* the invocation of the right to counsel in this case was limited. As in *Barrett,* the request made by the accused was unambiguous; Griffin wanted to talk to *his attorney* whom he identified by name. As in *Barrett,* the police honored Griffin's request.[4] As in *Barrett,* there is not one scintilla of evidence of police overreaching. Here, once Griffin asked to speak to his attorney, interrogation immediately ceased, and arrangements were made for Griffin to speak to the attorney he had requested. Furthermore, when Griffin had concluded his conversation with his attorney, the police sought to assure that his request had been fully honored by inquiring whether he wished to talk to any other attorney. At that point, Griffin stated that he did not want to speak to another attorney at that time. Before interrogation resumed, Griffin was once again given his *Miranda* rights. The Supreme Court's conclusion in *Barrett* applies with equally great force here: *there is no constitutional objective that could be served by suppression.*

---

**3.** This view comports with our refusal to give any "talismanic quality" to the mere word "attorney." *See United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985); *Nash v. Estelle,* 597 F.2d 513 (5th Cir.1979) (en banc). Thus, in our circuit, while an accused is not required to use any magic language to invoke the right to counsel, we do not ignore the plain meaning of his words in order to find invocation of the right to counsel.

**4.** The significance of honoring the request is underscored by our decision in *Silva v. Estelle,* 672 F.2d 457 (5th Cir.1982). There, the defendant asked to speak to his attorney. The police, however, continued interrogation and, on appeal, we held that because the request was not honored, the confession must be suppressed under *Edwards.*

■ In short, *Barrett* controls our analysis in this case. We therefore hold that, when an accused makes an unambiguous but limited request for counsel, in the absence of police interference with the accused's fifth amendment guarantee to counsel, interrogation may proceed after satisfaction of that request.

V

In conclusion, we turn to the remaining issues raised in this appeal, none of which we consider substantial. Griffin asserts that certain of the prosecutor's statements in closing argument violated his fourteenth amendment right to a fair and impartial trial. Federal habeas relief is appropriate if a prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974); *Ortega v. McCotter*, 808 F.2d 406, 407 (5th Cir.1987). We have examined the closing argument, particularly those portions to which Griffin now objects, and must conclude that the prosecutor's statements do not rise to the necessary level. The majority of the remarks were not improper at all, and the court adequately instructed the jury regarding the effect of those statements that may have been improper.

■ Griffin also contends that the trial court erroneously excused for cause veniremember Sandra Jackson. In *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the Supreme Court held: "To determine when a prospective juror may be excluded for cause because of his or her views on capital punishment, the inquiry is 'whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wicker v. McCotter*, 783 F.2d 487, 493 (5th Cir.), *cert. denied*, — U.S. —, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). The trial court's determination regarding exclusion of a juror is entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Witt*, 105 S.Ct. at 854–55. Although Jackson continually equivocated during her voir dire examination, she stated at several points that she would not cast her vote as a juror in a way that would lead to the death penalty. She was therefore properly excluded for cause.

■ Griffin asserts that the trial court's requiring each juror to take the oath set out in Texas Penal Code Ann. art. 12.31(b) was unconstitutional. The Texas Court of Criminal Appeals declined to review this issue on direct appeal because Griffin did not object to the oath at trial.[5] Under *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), we may consider this point only if Griffin shows good cause for his failure to raise it at trial and shows resulting actual prejudice. *Id.* Griffin attempts neither and the merits of this argument are not properly before us.

■ Griffin contends that the state's use of the testimony of Dr. John Nottingham and Dr. Jerome Brown violated his fifth and sixth amendment rights. We have held, however, that "when a defendant introduces psychiatric evidence on a critical issue, he waives his fifth and sixth amendment objections to the state's psychiatric testimony, provided that the state's evidence is used solely in rebuttal and properly limited to the issue raised by the defense." *Williams v. Lynaugh*, 809 F.2d 1063, 1068 (5th Cir.1987). Such is the case here and we therefore dismiss Griffin's argument.

Griffin's next issue on appeal relates to the effectiveness of his trial counsel. According to Griffin, his attorney was inefficient because he did not object to the failure of the prosecutor to inform him of the results of Griffin's competency examination and the state's intent to use those results at trial. We need not determine the standard applicable to a claim for ineffective assistance of counsel based on conduct of the government because the facts do not support Griffin's argument. The record

---

5. Griffin has not established that the article 12.-31(b) oath was actually given; the trial court transcript merely states that the jurors were sworn.

reflects that Griffin's counsel was provided with the psychologist's reports and that counsel filed a motion in limine to suppress those reports.

 Griffin also argues that the trial court erred in refusing to instruct the jury on the meaning of the words "deliberate" and "intentional" used in answering the special interrogatories in the penalty phase. In *Milton v. Procunier,* 744 F.2d 1091 (5th Cir.1984), we rejected this argument in the context of a request to allow questioning prospective jurors on these meanings. We concluded that the words "did have a plain meaning of sufficient content." *Id.* at 1096. Our reasoning in *Milton* compels our rejection of Griffin's argument.

Finally, Griffin argues that the introduction of extraneous offenses without prior notice violated his due process rights. We reject this contention because the record reflects that Griffin was in fact given notice that the state intended to offer this material into evidence.

### VI

For the reasons stated herein, the judgment of the District Court is affirmed.

AFFIRMED.

ALVIN B. RUBIN, Circuit Judge, dissenting:

The admissibility of Griffin's confession turns on the interpretation of what the officers said to him and what he said to them: did he effectively invoke his right to counsel? Because I think he did and because I do not agree with the majority's interpretation of what was said or with its construction of *Edwards v. Arizona,*[1] or *Connecticut v. Barrett,*[2] I respectfully dissent.

After the police began their interrogation of Griffin but before he confessed, Griffin asked to speak to a lawyer. Some of the officers testified that he requested "a" law-

yer; others testified that he requested "his" lawyer. Griffin then telephoned Tom Jennings, whom he thought to be "his" lawyer, and they talked for 5–10 minutes. Jennings telephoned back shortly thereafter, and talked with Griffin for a couple of minutes. After the second call, the officers asked Griffin what had happened, and he responded that Jennings would not represent him. The officers then asked him if he wanted another attorney, and Griffin replied that he did not want one at that time.

Griffin was then advised of his right to appointed counsel. At that point, Detective Kent, who apparently had reason to believe that Griffin might be less reluctant to speak with him than to talk with the other officers, began a conversation with Griffin. He testified:

> The only thing I told him, sir, was when I first got into the room, I said: Jeffery, I said, you know what you have done, and I know what you have done. I said, we need to sit down and talk about it, get it out in the open. He said at that time he liked the way I talked to him and started going into it.

Kent also testified that he explained to Griffin all of his rights under *Miranda,* including the right to court-appointed counsel, and that Griffin understood and waived his rights. Kent then elicited a confession.

The district court found that Griffin had "invoked his right to counsel and his request for a specific attorney was honored. When this attorney declined to represent Griffin, he knowingly and voluntarily waived his right to have further representation at that time." Presumably because the waiver theory is an inadequate basis for affirmance, my brothers find instead that Griffin's request was an *"unambiguous* limited request and *cannot* be interpreted as an invocation of his general right to counsel (emphasis added)."

Under *Edwards,* as construed by the Supreme Court in *Oregon v. Bradshaw,*[3] if

1. 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

2. ___ U.S. ___, 107 S.Ct. 828, 93 L.Ed.2d 920 (1987).

3. 462 U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

the right to counsel is invoked, the court first looks to see who *initiated* a subsequent conversation. If the police initiated the conversation, the analysis is over; the prophylactic *Edwards* rule has been violated. Only if the suspect initiated the conversation can the waiver issue arise.[4] While the concurring opinion in *Edwards* rejected the two-step analysis, calling for a single assessment of the totality of the circumstances on the question of waiver, with the issue of who initiated the conversation being only an important consideration,[5] the dissent also accepted the two-step analysis, so a majority of the Court took that view of *Edwards*.[6] Moreover, as the plurality opinion in *Bradshaw* noted, the *Edwards* court stated that a "necessary" fact in finding waiver is that the accused reopened the dialogue with the police.[7] Later, in *Solem v. Stumes*,[8] the Court expressly stated that, under *Edwards*, a waiver of the previously invoked right to counsel is acceptable only if the suspect initiates the subsequent conversation. The *Solem* Court also described the *Edwards* doctrine as a per se rule.[9] In *United States v. Webb*,[10] this circuit followed the Court in stating that waiver of the right to counsel after it has been invoked does not satisfy *Edwards* if the police initiated the subsequent discussion.

It is thus apparent why my brothers do not review the finding on which the district court opinion was based and instead make a new fact finding. If Griffin invoked his right to counsel, the confession is inadmissible because Detective Kent, not Griffin, initiated the interrogation that elicited the confession. The majority therefore accepts the government's contention that Griffin invoked only a "partial right" to counsel: he asked only for the right to speak to Jennings, so, when Jennings declined to represent him, he no longer sought a lawyer.

As my brothers note, the Supreme Court has recognized a partial invocation of the right to counsel in *Barrett*.[11] In that case, the suspect said he would speak to police but would give no written confession in the absence of counsel.[12] The court allowed the oral confession on the basis that the suspect asked for counsel's advice regarding only written statements.[13]

Unlike the situation in *Barrett*, Griffin did not accompany his request for counsel with "affirmative announcements of his willingness to speak with the authorities."[14] The Court in *Barrett* emphasized that we must not narrowly interpret a defendant's remarks about desiring counsel, saying:

> We do not denigrate the "settled approach to questions of waiver [that] requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel," *Michigan v. Jackson*, 475 U.S. [625], ——, 106 S.Ct. 1404, [1409], 89 L.Ed.2d 631 (1986), when we observe that this approach does little to aid respondent's cause. Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous.[15]

Unlike Barrett's request, which was unambiguous, Griffin's statement, if it was

---

4. *Id.* at 1044–46, 103 S.Ct. at 2834–35 (plurality opinion).

5. *Id.* at 1047–51, 103 S.Ct. at 2835–38 (Powell, J., concurring).

6. *Id.* at 1054 n. 2, 103 S.Ct. at 2840 n. 2 (Marshall, J., Brennan, J., Blackmun, J., and Stevens, J., dissenting).

7. *Id.* at 1045, 103 S.Ct. at 2834 (plurality opinion) (citing *Edwards*, 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9).

8. 465 U.S. 638, 646, 104 S.Ct. 1338, 1343, 79 L.Ed.2d 579 (1984).

9. *Id.* at 647, 104 S.Ct. at 1343.

10. 755 F.2d 382, 388 (5th Cir.1985), *cert. denied*, —— U.S. ——, 107 S.Ct. 894, 93 L.Ed.2d 846 (1987).

11. 107 S.Ct. at 832.

12. *Id.* at 830.

13. *Id.* at 832.

14. *Id.*

15. *Id.*

not a general invocation of the right to counsel, was at worse ambiguous. If I were the fact-finder, I would think it more likely that Griffin was interested in obtaining the quality of legal services that Jennings would provide rather than the personal services of Jennings and no one else. Griffin's later statement that he did not want to speak to another attorney at that particular time did not remove the ambiguity.

Unlike my brothers, I think Kent was indeed "badgering" Griffin within the meaning of *Edwards* and thus violating its prophylactic purpose. It is true that the badger intentionally cloaked his hostile intent, but he nevertheless initiated the conversation. Kent sought to evade at least one interpretation of Griffin's request, and was successful. The antiseptic effect of *Edwards*, as interpreted in *Barrett*, was destroyed.

Therefore, although I do not differ with the majority ruling on the other issues, I respectfully dissent.