STATE OF NORTH CAROLINA v. JAMES IRA LEVAN

No. 234A88

(Filed 7 February 1990)

**1. Criminal Law § 73.2 (NCI3d)— hearsay—statements against interest—admissible**

The trial court did not err in the prosecution of a cocaine dealer for murder by admitting various hearsay statements

where the statements constituted statements against the penal interest of the declarants; the facts of the case and non-hearsay testimony substantiate the trustworthiness of the statements; and, additionally, repetition of those hearsay statements in open court was against the penal interest of the witnesses testifying. N.C.G.S. § 8C-1, Rule 804(b)(3).

**Am Jur 2d, Evidence § 610.**

2. **Criminal Law § 46.1 (NCI3d)— murder—flight—evidence sufficient to support instruction**

The evidence in a murder prosecution supported the trial court's instruction on defendant's flight where defendant attempted to conceal the victim's body; ordered an accomplice to wipe fingerprints off the murder weapon and then to throw it into a nearby river from which it was never recovered; defendant and the accomplice later tried to throw the victim's clothes and personal effects into a dumpster and, thwarted by the arrival of a passing police officer, eventually threw the items over the guardrail along a major highway; and defendant approached a fellow inmate and offered him money if the inmate would smuggle a gun to him so that he could escape. The question is not where or how defendant chose to live in the year between the victim's death and his arrest; rather the relevant inquiry concerns whether there is evidence that defendant left the scene of the murder and took steps to avoid apprehension, and evidence of defendant's attempt to escape provides additional support for the instruction.

**Am Jur 2d, Evidence §§ 280, 623.**

3. **Criminal Law § 89.3 (NCI3d)— murder—prior consistent statements—slight variation—admissible**

The trial court did not err in a murder prosecution by admitting testimony of an SBI agent concerning remarks made to him by a witness who was then a suspect where there were variations in the details present in the trial testimony and the prior statements. The statements were sufficiently consistent with and supportive of the trial testimony to be admissible as corroborative; slight variations in statements that do not go to the heart of the testimony will not preclude the admission of prior statements as corroborative.

**Am Jur 2d, Evidence § 500.**

4. **Homicide § 15 (NCI3d) — murder — possession of large number of firearms — relevant**

The trial court did not err in a murder prosecution by admitting testimony that defendant owned a double-barreled sawed-off shotgun and that more than twenty handguns, long guns, and shotguns, including a double-barreled sawed-off shotgun, were found at defendant's residence where the testimony regarding defendant's ownership of a double-barreled sawed-off shotgun was relevant to show defendant's violent lifestyle as well as his relationship with the witness and the victim; a large number of weapons and large quantities of ammunition found at defendant's residence were relevant inasmuch as those facts pointed out that defendant owned .380 caliber ammunition and that a .380 caliber weapon was not found at his residence, supporting the theory that defendant shot the victim with a .380 caliber gun and then threw the gun in a nearby river; and defendant raised the issue of his interest in guns under direct examination and thus waived his right to complain of the admission of related evidence by the State.

**Am Jur 2d, Evidence §§ 288, 446.**

5. **Criminal Law § 70 (NCI3d) — murder — tape recording — admissible**

The trial court did not err in the murder prosecution of a drug dealer by admitting into evidence testimony about a conversation another suspect had with defendant which led to defendant's arrest as well as a tape recording of the conversation and a transcript of the tape recording. The pre-arrest warrantless recording of defendant's incriminating statements did not violate defendant's right to be free of unreasonable search and seizure under article 1, section 20 of the North Carolina Constitution inasmuch as defendant had no legitimate expectation of privacy regarding a conversation he voluntarily maintained with a confederate; defendant's article 1, section 23 right to be free from compulsory self-incrimination was not violated because his participation in the conversation was wholly voluntary; defendant's right to counsel under article 1, section 23 was not violated because the conversation in question occurred during the initial investigation of the suspect prior to his arrest; and there was no merit to the contention

that the recordings were improperly obtained or that their transcription or admission into evidence was in violation of 18 U.S.C. §§ 2510-2518.

**Am Jur 2d, Evidence § 436; Telecommunications § 216.**

APPEAL of right by defendant pursuant to N.C.G.S. § 7A-27(a) from judgment imposing sentence of life imprisonment entered by *Owens, J.,* at the 22 February 1988 Criminal Session of Superior Court, BURKE County, upon a jury verdict of guilty of murder in the first degree. Heard in the Supreme Court 11 December 1989.

*Lacy H. Thornburg, Attorney General, by John H. Watters, Assistant Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Daniel R. Pollitt, Assistant Appellate Defender, for defendant-appellant.*

MARTIN, Justice.

Defendant was convicted of murder in the first degree of Charles Jennings Feimster and sentenced to life in prison. Our examination of the five issues raised by defendant on his appeal reveals no prejudicial error.

Briefly, the facts show that in the spring of 1986, defendant James Ira Levan was in the business of selling cocaine in and around Statesville, North Carolina, where he also resided. At approximately 11:30 p.m. on Friday evening, 25 April 1986, defendant arrived at the home of Terry Kurley for the purpose of selling Kurley a gram of cocaine. Kurley went into his house to test the cocaine while defendant waited outside in his car. Kurley returned to the car and announced that he was dissatisfied with the quality of the cocaine. Defendant and Kurley argued and defendant angrily left Kurley's residence. After the defendant had left the premises, Kurley told his wife, Patricia Kurley Poore, that defendant had accused Kurley of "cutting" the cocaine while out of defendant's sight and that defendant had stated that Kurley was going to "pay for it."

During April of 1986, the victim, Charles Jennings Feimster, worked as a bouncer at a local gambling club in the Statesville area and was also known in the community as an enforcer who collected drug debts for defendant. Sometime between 11:30 p.m. and midnight on the evening of 25 April 1986, the victim called

STATE v. LEVAN

[326 N.C. 155 (1990)]

his wife, Susan Feimster Dugan, at work and told her he was going to help a friend before coming home and not to wait up for him. On the following day, his wife checked their answering machine and found a message from defendant stating, "Chuck, this is Jim, I have been burnt in a coke deal and I need your help." Testimony at trial indicated that defendant had contacted Feimster, the victim, and told him that he could keep any money he could collect from Kurley as a result of a failed drug deal.

Shortly after defendant had angrily left Terry Kurley's house, the victim Feimster appeared in Kurley's driveway. Taking a knife and a Doberman puppy with him, Kurley went outside to speak with Feimster, but came back to the front door to tell his wife to call the police. As Kurley's wife was calling the police, she heard a shot and ran to the door. From there, she saw her husband lying face down on the ground beside the porch and saw Charles Feimster running for his car. Terry Kurley died from a gunshot wound to the head.

Sometime between 12:45 a.m. and 1:00 a.m., Feimster returned to his home and told his wife that defendant had sent him to talk to an individual. He told her the individual had been armed with a sword and had a Doberman and that Feimster had reflexively shot the man because he thought the man had made a movement to go for a gun. Feimster told his wife he was going to call a friend, witness Willie John Campbell, to help him make arrangements to leave town. Before leaving, Feimster telephoned defendant and asked him to remove the license plates from his car and then to have it burned.

Witness Campbell later testified that Feimster called him sometime between 1:00 a.m. and 1:30 a.m. on 26 April 1986. Campbell testified that he then went to Feimster's house, drove Feimster to Charlotte and registered Feimster at a local motel there. When requested by Feimster to provide an alibi for him for the entire evening, Campbell refused.

While at the motel in Charlotte, Feimster arranged for another friend, witness Robert Smith, to pick up some personal items from Feimster's wife and deliver them to him in Charlotte. Before leaving Statesville, Smith stopped at defendant's house and received approximately $400.00 from the defendant to deliver to Feimster. Defendant also instructed Smith to take the victim, Feimster, as far south as he could. Ultimately, Smith and Feimster went to

Greenville, South Carolina, where Feimster checked into another motel. Smith then returned to Statesville. While at the motel in South Carolina, Feimster contacted his brother, witness Calvin Feimster, and told him initially that he had not killed Kurley. Later, Feimster told his brother that he had shot Kurley while collecting money for a drug debt but that the shooting was in self-defense.

In April of 1986, Steve Wooten was employed by defendant in a number of capacities, including enforcer, arsonist, bodyguard, driver, and drug dealer. At trial, Wooten testified that early in the morning of 26 April 1986 he was contacted by the defendant and asked to burn Feimster's car. On Sunday, 27 April 1986, defendant came to Wooten's home and told him that the two of them would need to go to South Carolina to pick up Feimster. Armed with a .380 automatic pistol and a .22 caliber revolver, the two men drove in Wooten's van to Greenville, South Carolina, where they met the victim in his motel room. Defendant told the victim that it would not be long before the police caught up with him in Greenville for the murder of Kurley and suggested that Feimster come with defendant and Wooten to defendant's cabin in the North Carolina mountains. After Feimster elected to go back to North Carolina with defendant, defendant told him not to call anyone.

Defendant, Wooten, and the victim left South Carolina and went back north on I-85, later switching to back roads to avoid detection. Outside of Morganton, North Carolina, on Highway 18, Wooten noticed the van was running out of gas. Fearing detection, Feimster did not want to go into town to get gas because the police were looking for him and he was afraid he would be identified. Consequently, defendant and the victim got out of the van to wait by the roadside until Wooten returned with the gas.

When Wooten returned, he blew his horn and defendant emerged from the woods alone. Coming around to the driver's side, defendant stated, "that is a heavy S.O.B. to move. Go down and move him further into the woods." Wooten went down to the bottom of the hill where Feimster's body was lying on the ground. Failing to find a pulse, Wooten ran back to the van and, with defendant driving, the two men began to drive back to Statesville. On the return trip, defendant gave Wooten his .380 automatic and told him to wipe defendant's prints off the gun and then throw the gun in a river which was adjacent to Highway 18. The two men

stopped once to try to throw Feimster's clothes and personal belongings into a dumpster, but were unsuccessful because a police officer drove by. Once back on I-40 heading for Statesville, however, Wooten pulled over and defendant threw the victim's clothing and personal belongings over a guardrail.

On the trip home, defendant told Wooten that he had killed Feimster because he was afraid Feimster would turn state's evidence against defendant regarding his cocaine dealings in exchange for a lighter sentence if the police arrested Feimster for the murder of Terry Kurley. Wooten testified at trial that defendant told him a few days later that he had walked up behind Feimster, put the .380 automatic to the back of his head, and pulled the trigger. At trial, however, defendant testified that he and Feimster had gotten into an argument while Wooten was getting gas for the van and that defendant had shot Feimster in self-defense.

Feimster's body was discovered at the bottom of a hill by the side of Highway 18 by a construction worker on 28 April 1986. An autopsy revealed that Feimster, an unusually large and powerful man, had been shot once in the back of the head with a bullet of a size consistent with a 9 mm., .38 caliber or .380 caliber gun.

On the morning of Tuesday, 29 April 1986, defendant voluntarily went to the County Sheriff's Department to see if there was a warrant issued for his arrest. Within forty-eight hours of the shooting, he had spoken with a total of five law enforcement officers to determine if a warrant had been issued in his name. At the Sheriff's Department, defendant explained to the deputy on duty that he would like to be called if a warrant appeared because his father had heart trouble and he would prefer to come to the sheriff's office voluntarily than to have a warrant delivered at his home.

On 14 April 1987, nearly a year after the shooting of Charles Feimster, an SBI agent provided Steve Wooten with a small tape recorder. Using the recorder, Wooten initiated a conversation with defendant in which defendant was implicated for Feimster's murder. An arrest warrant was issued on 27 April 1987 for defendant, and he was indicted for murder in the first degree of Charles Jennings Feimster on 11 May 1987. At trial and over defendant's repeated objections, the trial court admitted Wooten's testimony about his 14 April 1987 conversation with defendant, admitted the tape recording itself, and a transcript of the tape recording. On

STATE v. LEVAN

[326 N.C. 155 (1990)]

3 March 1988, the jury returned a verdict of guilty and on 4 March 1988 recommended that defendant be sentenced to life imprisonment.

[1]   On appeal, defendant raises five assignments of error. Defendant first contends that it was error for the trial court to admit a number of hearsay statements made by the victim, Charles Feimster, by Terry Kurley, and by the defendant to five witnesses who testified at trial. The five witnesses who entered hearsay statements were: (1) Robert Smith, the friend who drove the victim to Greenville, S.C. prior to his murder; (2) Calvin Feimster, the victim's brother; (3) John Campbell, the friend who drove the victim to Charlotte prior to his murder; (4) Patricia Kurley Poore, Terry Kurley's wife, and (5) Susan Feimster Dugan, the victim's wife.

The record shows that witness Robert Smith was permitted to testify over objection that Feimster repeatedly told him on the day following Kurley's murder that he, Feimster, had not shot Kurley and did not know why he was accused of murder. Smith was then permitted to testify that Feimster later told him he had gone to Kurley's house to collect a debt for defendant and that he had shot Kurley there. Smith also testified about instructions Feimster had given to Smith to help orchestrate Feimster's flight from Statesville. The victim's brother, Calvin Feimster, was similarly permitted to testify over objection regarding statements his brother had made to him to the effect that he had not shot Kurley. Calvin Feimster was also permitted to repeat later statements made to him by the victim confessing that he had gone to Kurley's house to collect a drug debt for defendant and that he had shot Kurley in self-defense. Additionally, the victim's brother repeated statements made to him by Feimster regarding his flight to Charlotte and his refusal to return to Statesville. Like Robert Smith and Calvin Feimster, witness John Campbell testified over objection that the victim had told him he had shot Kurley. Campbell also testified about the victim's efforts to get Campbell to provide an alibi for him during the time of Kurley's murder.

Patricia Kurley Poore, Terry Kurley's wife, repeated a number of hearsay statements made to her by her husband prior to his death. Specifically, she was allowed to repeat their conversation regarding Kurley's cocaine deal with defendant to the effect that defendant had accused Kurley of "cutting" the cocaine and that defendant had warned Kurley that he was "going to pay" for tampering with the drug. Finally, the victim's wife, Susan Feimster Dugan,

STATE v. LEVAN

[326 N.C. 155 (1990)]

testified about a number of statements Feimster had made to her prior to his death. Among the hearsay statements admitted during Dugan's testimony was the victim's assertion that the defendant "sent him over to this individual's home in order to talk with him concerning a coke deal . . . and on reflex he drew his gun . . . and shot the individual" in self-defense. Dugan further testified that Feimster had told her "from time to time that he would run errands for [defendant] concerning cocaine deals."

Prior to trial, the state had filed several notices of intention to introduce hearsay statements at trial pursuant to North Carolina Evidence Rule 804(b)(5). In the notices, the state showed its intention to introduce various hearsay statements through the testimony of the five witnesses set forth above. Defendant filed a motion to suppress this evidence, arguing that it was inadmissible as untrustworthy hearsay and did not fall under any other hearsay exceptions. After conducting separate *voir dire* hearings of the witnesses in question, the trial court found all the challenged statements to be admissible under Rule 804(b)(5) and permitted the five witnesses to testify about the hearsay statements.

On appeal, defendant argues that the trial court made almost an identical error in every instance in permitting these statements to come into evidence. It is defendant's contention that the trial court failed to follow the guidelines set out by this Court in *State v. Triplett*, 316 N.C. 1, 340 S.E.2d 736 (1986), for admission of hearsay evidence under Rule 804(b)(5) and that such failure constituted reversible error. Upon examining the record, we find that the hearsay statements in question constituted statements against the penal interest of the declarants, Charles Feimster, Terry Kurley, and defendant. As such, these statements are admissible hearsay under Rule 804(b)(3) of the North Carolina Rules of Evidence. N.C.G.S. § 8C-1, Rule 804(b)(3) (1986). Hence, we find it unnecessary to examine defendant's contentions regarding the trial court's application of the more stringent standards set forth in *State v. Smith*, 315 N.C. 76, 337 S.E.2d 833 (1985), and incorporated in *Triplett* for the admission of hearsay evidence under the catchall provision of Rule 804(b)(5). *See State v. McElrath*, 322 N.C. 1, 366 S.E.2d 442 (1988).

"The circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for

good reasons that they are true." *State v. Wilson*, 322 N.C. 117, 132, 367 S.E.2d 589, 598 (1988) (citing N.C.G.S. § 8C-1, Rule 804(b)(5) (1986), comment). In an effort to avoid fabrication of statements against penal interest which might exculpate a defendant, Rule 804(b)(3) includes an additional requirement that "a statement tending to expose the declarant to criminal liability is not admissible in a criminal case unless corroborating circumstances clearly indicate the trustworthiness of the statement." In the case before us, the facts surrounding Terry Kurley's death, Charles Feimster's efforts to flee Statesville, and non-hearsay testimony regarding defendant's involvement with drugs all substantiate the trustworthiness of the admitted statements. In reaching this conclusion, we note that in addition to having been against the penal interest of each of the declarants, repetition of these hearsay statements in open court is against the penal interest of the witnesses testifying. The implication of the witnesses' penal interest, while unnecessary for a hearsay analysis, adds an additional circumstantial guarantee of the trustworthiness of the testimony in this case. Finally, we are mindful that a number of the admitted hearsay statements are arguably neutral on their face and note that non-incriminating collateral statements are also admissible under Rule 804(b)(3) when they are integral to the larger statement more clearly admissible as being directly against declarant's penal interest. *State v. Wilson*, 322 N.C. 117, 367 S.E.2d 589. Based on our conclusion that these statements are admissible under Rule 804(b)(3), we find no merit in defendant's contention that admission of these hearsay statements constituted reversible error.

[2] Defendant next contends that a new trial is in order because there was insufficient evidence supporting the trial court's jury instruction about defendant's flight. Following an unrecorded charge conference, the trial court instructed the jury as follows:

> The State contends that the defendant fled. Evidence of flight may be considered by you together with all other facts and circumstances in this case in determining whether the combined circumstances amount to an admission or show a consciousness of guilt. However, proof of this circumstance is not sufficient in itself to establish guilt.

Defendant correctly notes that our courts have long held that a trial court may not instruct a jury on defendant's flight unless "there is some evidence in the record reasonably supporting the

theory that defendant fled after commission of the crime charged." *State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977). *See also State v. Moxley*, 78 N.C. App. 551, 557, 338 S.E.2d 122, 125 (1985), *disc. rev. denied*, 316 N.C. 384, 342 S.E.2d 904 (1985). However, defendant erroneously concludes that his open and conspicuous return to his home in Statesville following the shooting as well as his conspicuous approach to five law enforcement officers within forty-eight hours of Feimster's murder necessarily preclude a finding that defendant fled in this case.

The question in this case is not where or how defendant chose to live in the year between the victim's death and defendant's arrest. Rather, the relevant inquiry concerns whether there is evidence that defendant left the scene of the murder and took steps to avoid apprehension. In this case, defendant did not merely drive home following the shooting as he contends. Rather, he attempted to conceal the victim's body by ordering Wooten to drag it further into the woods by the roadside where the shooting had occurred. Further, he ordered Wooten to wipe the fingerprints off the gun and then to throw the murder weapon into a nearby river from which it was never recovered. Still later, defendant and Wooten tried to throw the victim's clothes and personal effects into a dumpster and, thwarted by the arrival of a passing police officer, eventually threw the items over the guardrail along a major highway. These actions are clearly sufficient to support the trial court's instruction on flight.

Additionally, following his arrest defendant approached a fellow inmate and offered him money if the inmate would smuggle a gun to him so that he could escape. It is well settled in this state that an escape from custody constitutes evidence of flight. *State v. Sheffield*, 251 N.C. 309, 111 S.E.2d 195 (1959); *State v. Miller*, 26 N.C. App. 190, 215 S.E.2d 181 (1975). Evidence of defendant's attempt to escape provides additional support for the trial court's instruction on flight. Concerning the instruction, we find no error.

[3] The defendant's third assignment of error involves testimony of SBI Special Agent Call concerning remarks made to him by witness Steve Wooten during a number of interviews conducted by the SBI while Wooten was himself a suspect in Feimster's murder. Defendant raises objections to seven specific instances in which Agent Call recounted statements made by Wooten which the defendant believes contradict or add new facts to Wooten's trial

testimony. As such, defendant asserts that these statements are non-corroborative and hence constitute inadmissible hearsay. Our examination of the trial testimony and the relevant case law reveals that in each instance Agent Call's testimony was properly allowed for the purpose of corroborating Wooten's prior testimony and is not inadmissible hearsay.

Defendant complains that it was error for Agent Call to have been permitted to testify that Wooten told him in April of 1987: (1) that defendant was afraid that Feimster would be identified if Feimster went back to get gas with Wooten and that defendant told Feimster that the two of them would wait by the roadside while Wooten got gas when at trial Wooten had testified that it was Feimster himself who initiated these remarks; (2) that defendant threw the murder weapon out of the van into the river after the shooting when at trial Wooten had testified that defendant had ordered Wooten to throw the pistol out of the van; (3) that Wooten accompanied one of defendant's friends to Florida to pick up two ounces of pure cocaine on two occasions and that Wooten's job was to drive and watch money when at trial Wooten had not mentioned the trips to Florida; (4) that defendant kept cocaine stashed in large coolers that he had buried underground in two different locations near his property when at trial Wooten had not mentioned these coolers; (5) that defendant told Wooten in April 1986 that he had cut Kurley off from getting more cocaine because Kurley was not paying his drug debts and that defendant and Wooten discussed collecting Kurley's drug debt when Wooten had not mentioned these facts in his testimony; (6) that Feimster sold long guns and pistols for defendant when Wooten had not made this statement during his testimony; and (7) that defendant told Wooten that he was planning to set Wooten up in a cocaine selling business when Wooten had not testified to that effect.

Corroboration has been defined as "the process of persuading the trier of the facts that a witness is credible—the opposite of impeachment." 1 Brandis on North Carolina Evidence § 49 (1982). Under North Carolina law, a trial court has wide latitude in deciding when a prior consistent statement can be admitted for corroborative, non-hearsay purposes. See generally id. at §§ 50-52 and cases cited therein. This Court has defined corroboration as meaning, "to strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence." State v. Higgenbottom, 312 N.C. 760, 769, 324 S.E.2d 834, 840 (1985). See also State v. Riddle, 316

N.C. 152, 340 S.E. 2d 75 (1986). Under the case law of this state, the latitude for admission of prior consistent statements is so wide that we do not require that a witness be impeached before a prior consistent statement is admissible as corroborative. *State v. Burton*, 322 N.C. 447, 368 S.E.2d 630 (1988); *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790 (1987); *State v. Riddle*, 316 N.C. 152, 340 S.E.2d 75 (1986); *State v. Martin*, 309 N.C. 465, 308 S.E.2d 277 (1983).

The theory behind admitting prior consistent statements for the non-hearsay purpose of buttressing the credibility of a witness "rests upon the obvious principle that, as conflicting statements impair, so uniform and consistent statements sustain and strengthen [the witness'] credit before the jury." *Jones v. Jones*, 80 N.C. 246 (1879). A prior consistent statement may be admissible as non-hearsay even when it contains new or additional information when such information tends to strengthen or add credibility to the testimony which it corroborates. *State v. Burton*, 322 N.C. 450, 368 S.E.2d 630; *State v. Kennedy*, 320 N.C. 20, 357 S.E.2d 359 (1987); *State v. Howard*, 320 N.C. 718, 360 S.E.2d 790; *State v. Ramey*, 318 N.C. 457, 349 S.E.2d 566 (1986) (disapproving prior cases *contra*); *State v. Higgenbottom*, 312 N.C. 760, 324 S.E.2d 834; *State v. Burns*, 307 N.C. 224, 297 S.E.2d 384 (1982).

Applying these standards to the specific statements objected to by defendant here, we find that in each and every instance the statements were sufficiently consistent with and supportive of the witness' trial testimony to be admissible as corroborative. While there are admittedly slight variations in the details present in the trial testimony and the prior statements, the spirit of the statements made prior to trial and of the in-trial testimony was the same. Slight variations in statements that do not go to the heart of the testimony will not preclude the admission of prior statements as corroborative. *State v. Locklear*, 320 N.C. 754, 360 S.E.2d 682 (1987). Because these statements were admitted for the purpose of substantiating the witness' credibility, they were not offered for their substantive truth and consequently were not hearsay. We find no error in the admission of these statements.

[4] Defendant next contends that he was prejudiced by witness Wooten's testimony that the defendant owned a double-barreled sawed-off shotgun and by Agent Call's testimony that more than twenty handguns, long guns, and shotguns, including a double-

barreled sawed-off shotgun, were found at defendant's residence. We find no merit to defendant's contention.

Under Rule 402 of the North Carolina Rules of Evidence, all relevant evidence is generally admissible. Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." During presentation of the state's case, testimony was admitted showing that when Robert Smith went to defendant's house to pick up money to help Feimster's escape from North Carolina, Steve Wooten was on defendant's front porch holding a sawed-off shotgun which had been given to him by defendant so that Wooten could protect him. Further testimony indicated that the victim was killed with a .380 caliber weapon and that the SBI found ammunition in .380 caliber at defendant's residence but no .380 caliber gun was among the other guns found there.

We find Wooten's testimony regarding defendant's ownership of a double-barreled sawed-off shotgun and defendant's decision to give the shotgun to Wooten for the purpose of protecting defendant to be relevant evidence tending to show the violent nature of defendant's lifestyle as well as his relationship with both witness Wooten and the victim, Feimster. Furthermore, the large number of weapons and large quantities of ammunition found at defendant's residence were relevant inasmuch as these facts pointed out that defendant owned .380 caliber ammunition but a .380 caliber weapon was not found at his residence. This evidence supported the state's theory of the case, which was that defendant shot the victim with a .380 caliber automatic gun and then threw the gun in a nearby river following the shooting. Finally, we note that the defendant presented testimony on direct examination that he was a hunter and a gun collector, and that he sold and traded guns. Having raised the issue of his interest in guns on direct examination, defendant has waived his right to complain of the admission of related evidence presented by the state. *State v. Artis*, 325 N.C. 278, 384 S.E.2d 470 (1989); *State v. Wright*, 282 N.C. 364, 192 S.E.2d 818 (1972). We find that defendant's concern regarding admission of this evidence is unfounded.

[5] Defendant's remaining assignment of error raises state constitutional questions concerning the admissibility of testimony about a conversation which Steve Wooten had with the defendant which

led to the defendant's arrest, as well as state constitutional questions concerning the admissibility of a recording of the conversation and a transcript of the tape recording. In April of 1987, witness Steve Wooten was a suspect himself in the murder of Charles Feimster. He was interviewed by agents of the SBI and assured them that the defendant, in fact, committed the murder. Wooten offered to prove his contention to the law enforcement officers by obtaining a recorded statement from the defendant confirming defendant's killing of the victim. On 14 April 1987, SBI Agent Call placed a small tape recorder on Wooten. On that same day, Wooten approached defendant and initiated a conversation with him in which defendant ultimately implicated himself in the murder. At trial, Wooten testified about that conversation and others he had had with defendant concerning the shooting. The tape recording itself was played for the jury, while each jury member was given a transcript of the tape recording to help them understand its content.

Defendant asserts that he is entitled to a new trial because the tape recording was obtained in violation of his constitutional right to be free from unreasonable search and seizure under article 1, section 20 of the North Carolina Constitution and in violation of his right not to be compelled to give self-incriminating evidence as guaranteed by article 1, section 23 of the North Carolina Constitution. It is defendant's contention that since Steve Wooten was a close friend of defendant's, defendant had a reasonable expectation of privacy in their conversations together and that Wooten adopted the pose of a co-conspirator to trick and disarm defendant. Defendant believes that to permit Wooten to record a conversation with defendant for the purpose of obtaining evidence against him would be tantamount to permitting the state to do through Wooten what it could not constitutionally do itself—obtain a statement from a suspect by trickery without giving any constitutionally required Miranda warnings. Thus, without specifically stating so, it appears that defendant further alleges violations of his constitutional right to counsel. Finally, defendant submits a *pro se* argument that the tape recordings were illegally obtained in violation of 18 U.S.C. §§ 2510-2518 (1988) and that inaccuracies in the transcript of the recordings should have prohibited admission of the transcript into evidence.

Even though the pertinent provisions of the state and federal constitutions are textually dissimilar, we find it helpful to examine

the United States Supreme Court decisions concerning similar challenges under the parallel provisions of the United States Constitution. In *Hoffa v. United States*, 385 U.S. 293, 17 L. Ed. 2d 374 (1966), the United States Supreme Court found that the police are not required to presume there is honor among thieves and that when an individual knowingly carries on an incriminating conversation with another individual, no legitimate fourth amendment right to be free from unreasonable search and seizure has been implicated. In *Hoffa*, the Court reasoned that where a government informant elected to testify to an incriminating conversation voluntarily carried on in his presence or directed to him, the informant was not a "surreptitious eavesdropper" and no privacy interest of the defendant had been violated. *See also Lopez v. United States*, 373 U.S. 427, 10 L. Ed. 2d 462 (1963) (holding that testimony of an agent about a recorded incriminating conversation and the recording itself were both clearly admissible). The Court in *Hoffa* further held that defendant's fifth amendment right to be free from compulsory self-incrimination had not been violated by the informant's testimony. In view of the fact that the defendant's conversations with the confederate in *Hoffa* were wholly voluntary, the Court reasoned that the necessary element of compulsion was absent. Without some kind of compulsion, defendant's fifth amendment privilege against self-incrimination did not come into play. *Hoffa v. United States*, 385 U.S. at 304, 17 L. Ed. 2d at 383. Finally, the defendant in *Hoffa* presented a sixth amendment argument, similar to defendant's in this case, which was summarily dismissed by the Supreme Court. As stated by that Court, the defendant's argument was that:

> Not later than October 25, 1962, the Government had sufficient ground for taking the petitioner into custody and charging him. . . . Had the Government done so, it could not have continued to question the petitioner without observance of his Sixth Amendment right to counsel. (Citations omitted). Therefore, the argument concludes, evidence of statements made by the petitioner subsequent to October 25 was inadmissible, because the Government acquired that evidence only by flouting the petitioner's Sixth Amendment right to counsel.

*Id.* at 309-10, 17 L. Ed. 2d at 386. In response, the Supreme Court concluded:

> Nothing in . . . any case . . . that has come to our attention, even remotely suggests this novel and paradoxical constitu-

tional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Id.* at 310, 17 L. Ed. 2d at 386.

Having established the principles underlying the limits on constitutional protections to be afforded incriminating conversations, the Supreme Court next had an opportunity to determine the extent to which electronic surveillance or recordings of such conversations could be admitted into evidence. In *United States v. White*, 401 U.S. 745, 28 L. Ed. 2d 453 (1971), an informant was provided with a radio transmitter which allowed his conversations with defendant to be simultaneously monitored by law enforcement officers. The Court held that admission of the testimony of law enforcement agents who had monitored the conversations without a warrant was not a constitutional violation of defendant's rights. In *White*, the Court noted that:

No warrant to "search and seize" is required [when a defendant misplaces trust in an apparent colleague], nor is it when the Government sends to defendant's home a secret agent who conceals his identity and makes a purchase of narcotics from the accused, *Lewis v. United States*, 385 U.S. 206 (1966), or when the same agent, unbeknown to the defendant, carries electronic equipment to record the defendant's words and the evidence so gathered is later offered in evidence. *Lopez v. United States*, 373 U.S. 427 (1963).

*Id.* at 749, 28 L. Ed. 2d at 457. In concluding that defendant's constitutional rights were not violated, the Court further reasoned:

If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy, neither does a simultaneous recording of the same conversations made by

the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

*Id.* at 751, 28 L. Ed. 2d at 458.

Under the rulings of the United States Supreme Court, then, the evidence challenged by defendant here would not be inadmissible under federal constitutional grounds. Defendant in this case, however, bases his constitutional claims not on the fourth, fifth, or sixth amendments of the United States Constitution, but rather rests his arguments solely on state constitutional grounds. As this Court stated in *State v. Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988), even though our state constitutional provisions are virtually identical to their federal counterparts, "we have the authority to construe our own constitution differently from the construction by the United States Supreme Court of the Federal Constitution . . . . *Michigan v. Long*, 463 U.S. 1032, 77 L. Ed. 2d 1201; *State v. Arrington*, 311 N.C. 633, 642, 319 S.E.2d 254, 260 (1984)." 322 N.C. at 713, 370 S.E.2d at 555. However, in this case we decline to do so.

Adopting the reasoning of the United States Supreme Court set forth above, we hold that the pre-arrest warrantless recording of defendant's incriminating statements through the witness Wooten did not violate defendant's right to be free of unreasonable search and seizure under article 1, section 20 of the North Carolina Constitution inasmuch as defendant had no legitimate expectation of privacy regarding a conversation he voluntarily maintained with a confederate. Further, defendant's article 1, section 23 right to be free from compulsory self-incrimination was not violated because his participation in the conversation was wholly voluntary, albeit ill-advised. *See State v. Farrell*, 223 N.C. 804, 807, 28 S.E.2d 560, 563 (1944) ("The constitutional inhibition against compulsory self-incrimination, Art. I, sec. 11, is directed against compulsion, and not against voluntary admissions, confessions, or testimony freely given on the trial."). *See also State v. Sheffield*, 251 N.C. 309, 111 S.E.2d 180 (1959). Finally, we find that defendant's article 1, section 23 right to counsel alluded to by defendant was not violated because the conversation in question occurred during the initial investigation of the suspect prior to his arrest. While article 1, section 23 contains a guarantee of right to counsel, that right does not attach to all events leading to trial, but rather only to "critical

stages" of the proceedings. *State v. Odom*, 303 N.C. 163, 277 S.E.2d 352, *cert. denied*, 454 U.S. 1052, 70 L. Ed. 2d 587 (1981), *reh'g denied*, 454 U.S. 1165, 71 L. Ed. 2d 322 (1982). *See also State v. Hall*, 39 N.C. App. 728, 252 S.E.2d 100 (1979). In examining the sixth amendment right to counsel, this Court determined that the pre-arrest investigative stage of a criminal proceeding is not a "critical stage" to which the right to counsel attaches under the Federal Constitution. *State v. Detter*, 298 N.C. 604, 260 S.E.2d 567 (1979). Similarly, we now conclude that defendant's right to counsel under the state constitution was not violated by the SBI's pre-arrest investigation which resulted in the tape recording and testimony in question here.

The final issue for review concerns defendant's *pro se* argument that the state's investigative procedure violated federal wiretapping statutes. We find no merit to defendant's contention that the recordings in question were improperly obtained nor that their transcription or admission into evidence was in violation of 18 U.S.C. §§ 2510-2518 (1988).

Having carefully examined each of defendant's contentions, we hold that the defendant received a fair trial free of prejudicial error.

No error.