STATE OF NORTH CAROLINA v. KENNETH LEE TUCKER AND HOYLE EUGENE WRAY

No. 332A89

(Filed 5 March 1992)

1. **Evidence and Witnesses § 1214 (NCI4th)— codefendants — statement of one not admissible**

The trial court in a murder prosecution properly excluded statements made by codefendant Tucker on 12 April 1988 as hearsay and under the authority of *Bruton v. United States*, 391 U.S. 123, where codefendant on that date gave a detailed statement implicating himself, Donna Tucker (his wife and defendant Wray's sister), and Wray, stating that Wray hired the Tuckers to kill Cecil in exchange for $1,000 in cash and $1,000 in pills; Tucker described meeting Cecil and driving around with her as the Tuckers and Cecil looked for hidden pills; according to defendant Tucker, he began to have doubts about killing Cecil, but hit Cecil over the head at Donna Tucker's urging; and Wray paid the Tuckers the next day and told them how to get rid of the car.

Am Jur 2d, Evidence §§ 263, 658.

Supreme Court's application of rule of Bruton v. United States (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S.Ct. 1620, holding that accused's rights under confrontation clause of Federal Constitution's Sixth Amendment are violated where codefendant's statement inculpating accused is admitted at joint trial. 95 L. Ed. 2d 892.

2. **Evidence and Witnesses § 1214 (NCI4th) — codefendants — statement of one — admissible**

The trial court erred in a murder prosecution by precluding admission of a statement made by codefendant Tucker on 15 April 1987 because a statement is inadmissible as to a codefendant only if it is made outside his presence and incriminates him. The statement here does not incriminate defendant Wray; was not inadmissible hearsay because, upon Tucker's invocation of his right not to testify, it was a statement against penal interest by an unavailable witness; the statement was such that the declarant would understand its damaging potential; statements that subject the declarant to criminal liability for offenses other than those for which defendant is on trial are admissible under N.C.G.S. § 8C-1, Rule 804(b)(3); and the evidence provides the requisite indications of trustworthiness.

Am Jur 2d, Evidence §§ 541, 618, 620; Homicide § 344.

Witness' refusal to testify on ground of self-incrimination as justifying reception of evidence of prior statements or admissions. 43 ALR3d 1413.

3. **Evidence and Witnesses § 1214 (NCI4th) — codefendants — statement by one incriminating the other — admissible**

The trial court erred in a murder prosecution by precluding admission of the 22 and 25 February 1988 statements in which defendant Tucker said that codefendant Wray had killed Cecil, the victim, where Wray sought to use the statements to support his defense that the Tuckers planned and executed the murder without any involvement on his part and conspired to implicate him in order to get a deal from the State. The trial court erroneously applied *Bruton v. United States*, 391 U.S. 123, because Wray sought to include rather than exclude statements by his codefendant. Further, because Wray did not offer the statements as the truth of the matters asserted,

but to discredit the State's theory of the case, the statements are not inadmissible hearsay. N.C.G.S. § 8C-1, Rule 801(c).

**Am Jur 2d, Evidence §§ 619, 620; Homicide § 344.**

4. **Evidence and Witnesses § 1214 (NCI4th) — codefendants — exclusion of statements — prejudicial**

The trial court's error in excluding statements of a codefendant in a murder prosecution was not harmless where the sole direct evidence against Wray, who sought to include the evidence, was the testimony of Donna Tucker, an interested witness of highly questionable credibility; Wray's defense was that the Tuckers killed the victim, Cecil, with no knowledge or involvement on his part, then sought to escape punishment by implicating him; and the number of and inconsistencies in defendant Tucker's pretrial statements not only support this theory, but could well have fatally undermined the State's theory of the case as contained in the testimony of Donna Tucker. N.C.G.S. § 15A-1443(a).

**Am Jur 2d, Evidence §§ 619, 620; Homicide § 344.**

5. **Criminal Law § 1293 (NCI4th) — murder — conviction based on testimony of coconspirator — sentencing**

There was no prejudice in a murder prosecution where defendant contended that he should not have been convicted of a Class A or capital felony because his conviction was based solely on the uncorroborated testimony of a coconspirator. However, the jury found that the conviction was not based solely on the uncorroborated testimony of one or more principals, and, although defendant Wray challenged the trial court's instructions defining corroboration, he did not object at trial and cannot now assign error. Even assuming that the conviction was based on the uncorroborated testimony of a coconspirator, there is no prejudice because defendant received a life sentence and cannot be subjected to the death penalty at his new trial. N.C.G.S. § 14-5.2.

**Am Jur 2d, Conspiracy §§ 43, 44, 46; Evidence §§ 1151-1153.**

6. **Constitutional Law § 265 (NCI4th) — invocation of right to counsel — continued questioning — new trial**

Defendant Tucker was granted a new trial for murder where he was taken to district court on 20 April and a public

defender was appointed for him; the public defender talked to defendant later that afternoon or evening and told defendant not to talk or go with anyone without counsel; deputy Siwinski met with defendant Tucker on 21 April in the Guilford County Jail Complex and stated that he wanted Tucker to go with him to Surry County; Tucker told Siwinski what his lawyer had said; Tucker tried to call his attorney twice that morning; and Siwinski told Tucker that they needed to hurry and something to the effect that "if I want you, I'll tell you. I want Gene," a codefendant. Statements made on 21 April were obtained in violation of defendant's Fifth and Sixth Amendment rights.

**Am Jur 2d, Criminal Law §§ 791, 792, 796.**

**Requirement, under Federal Constitution, that law enforcement officers' custodial interrogation of suspect cease after suspect requests assistance of counsel— Supreme Court cases. 83 L.. Ed. 2d 1087.**

Justice LAKE did not participate in the consideration or decision of this case.

APPEAL by defendants of right pursuant to N.C.G.S. § 7A-27(a) from judgments imposing sentences of life imprisonment entered by *Rousseau, J.,* at the 1 May 1989 Criminal Session of Superior Court, GUILFORD County, upon jury verdicts finding defendants guilty of first-degree murder. Heard in the Supreme Court 16 October 1991.

*Lacy H. Thornburg, Attorney General, by David F. Hoke, Assistant Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Constance H. Everhart, Assistant Appellate Defender, for defendant appellant Tucker.*

*Charles T. Browne and C. Richard Tate, Jr., for defendant appellant Wray.*

WHICHARD, Justice.

Defendants were convicted of the first-degree murder of Brenda Cecil. Their cases were consolidated for trial over the objections of both defendants. The joinder raised perceived *Bruton* problems

because defendant Tucker had made several inconsistent, pretrial statements. After lengthy debate, the State acknowledged that it could not properly "sanitize" certain statements by defendant Tucker and announced that it would not offer them. The State also chose not to offer other statements of defendant Tucker that undermined its theory of the case. Defendant Wray was not able to cross-examine defendant Tucker about the latter statements because defendant Tucker invoked his Fifth Amendment right not to incriminate himself. As a result, defendant Wray contends that the joinder of the cases prevented him from introducing certain of defendant Tucker's statements that either exonerated defendant Wray or were inconsistent with the State's theory of the case. We hold only that defendant Wray was entitled to introduce defendant Tucker's statements. We therefore order a new trial for defendant Wray. We also grant defendant Tucker a new trial because the trial court erroneously admitted a statement obtained from him in violation of his Fifth and Sixth Amendment rights.

Donna Tucker, defendant Tucker's wife and defendant Wray's sister, was a principal State witness against both defendants. She testified pursuant to an agreement with the State that allowed her to plead guilty to the second-degree murder of Cecil in exchange for her testimony against defendants. She testified that she and defendant Tucker killed Cecil at the behest of defendant Wray, who wanted to eliminate Cecil as a witness against him in a drug case.

About a month prior to Cecil's death, the Guilford County Sheriff's Department was investigating her for suspected drug activity. On 29 August 1986, on the basis of a tip, a deputy sheriff observed Cecil enter defendant Wray's place of business, Mid-State Welding Company. The officer saw Donna Tucker enter Mid-State about the same time. When Cecil left the premises, other officers stopped her, searched her car, and seized several Dilaudid tablets, Fiorinal tablets, a needle and syringe, and defendant Wray's business card. The officers then obtained a warrant to search Mid-State and there discovered twenty-one Dilaudid tablets, five Valium tablets, some marijuana, and two revolvers. Both Cecil and defendant Wray were charged with various drug offenses and scheduled for court appearances on 16 (Cecil) and 17 (Wray) September 1986.

Cecil did not make her court appearance. At trial, her mother, Patricia Stout, testified that she had last seen Cecil on 11 September 1986. That evening a white female, whom Stout identified at trial

as Donna Tucker but who introduced herself as Debbie Peterson, approached Stout at her home in Greensboro, which she shared with Cecil and Cecil's brother Barry. Donna asked for Cecil, who was not at home. Donna then left. She returned a second time and found Cecil still absent. When Cecil returned at about 10:00 p.m., her mother told her about the visitor, whom Cecil said she did not know. When Donna came back a third time, however, Cecil went outside with her and followed Donna's black car with her own car. Stout testified that her daughter returned at about 10:50 p.m., riding in the black car with Donna and a white male. Cecil retrieved her work shoes and left again in the black car, saying she was going to work. Stout never saw her again.

At first Stout thought her daughter might have gone on vacation with a friend, but on 23 September 1986 she reported her daughter missing. The missing person investigation turned into a murder investigation upon the discovery of Cecil's body on 24 September 1986. Her body was found in an advanced state of decomposition in a rural wooded area in Surry County, with a short piece of television antenna wire looped around the neck. An autopsy revealed that she was four months pregnant and that she died from ligature strangulation.

On 15 October 1986, S.B.I. Agent J. W. Bryant and Detective Schmidt of the Greensboro Police Department interviewed Donna. She told them she had a drug relationship with Cecil and that she and defendant Tucker had gone to Greensboro on 11 September in response to a phone call from Cecil for drugs. Donna, defendant Tucker, and Cecil spent the evening driving around taking drugs. Donna told the officers she last saw Cecil riding away with someone in a red Pontiac.

Subsequently, in April 1988, Donna and defendant Tucker were arrested on charges of armed robbery and first-degree burglary in Randolph County. While in custody, on 6 April, Donna made a tape-recorded statement that her brother, defendant Wray, had hired her and defendant Tucker to kill Cecil, which they did on 11 September. Following her release on bond, however, Donna told several people that her 6 April statement was not true. She also wrote a letter to her mother on 11 July 1988 denying any involvement in the murder on defendant Wray's part. On 11 April 1988, Donna told law enforcement officers defendant Wray had nothing to do with the murder of Cecil. When faced with these inconsistent

statements at trial, Donna recanted them and the letter, claiming that they were motivated by fear that her family would turn against her. Donna testified that she wrote the letter at the request of her mother and upon the insistence of defendant Wray.

At trial, Donna testified that at the time of the murder her husband, defendant Tucker, was a heavy and dependent user of Dilaudid and that she purchased it for him from her brother, defendant Wray. On 10 September 1986, defendant Wray told Donna he wanted to get rid of someone. On 11 September, the Tuckers met with defendant Wray, who explained that he wanted to get rid of a girl who was going to testify against him in a drug case. The Tuckers agreed to kill Cecil for $2,000.

Donna further testified that she and defendant Tucker left immediately for Greensboro. They made several phone calls to Cecil's home from a shopping center. Eventually Cecil met them at the shopping center, where the Tuckers lured her into their car with a story that they had hidden the drugs elsewhere. They drove around for a while, and both defendant Tucker and Cecil were "shooting up" some Dilaudid. At one point they returned to Cecil's house, where Cecil retrieved her work shoes. Finally, they went to a wooded area and began to search for the pills. During this activity, defendant Tucker hit Cecil with a tire tool and began to choke her. Donna watched and took Cecil's pulse while defendant Tucker choked her. Afterwards, defendant Tucker slipped antenna wire around Cecil's neck. The Tuckers then drove to Surry County and dumped the body.

The next day, defendant Wray paid them $1,000 in cash and $1,000 in pills, remarking that defendant Tucker would end up using the money for pills anyway. Donna told her brother she did not want the car anymore because a dead body had been in it. She asked him to have someone burn it, and he agreed. Defendant Wray instructed the Tuckers to go to the movies the following Tuesday and to leave a $100 bill in the glove compartment and the keys in the car. The following Tuesday, the car disappeared. An Archdale policeman discovered it burning on 16 September.

Both defendants closely cross-examined Donna about her various inconsistent statements. The State attempted to rehabilitate her with corroborating testimony from her attorney and from law enforcement officers. The State also introduced records of eighteen long-distance phone calls from the Stout residence to the home

of defendant Wray's girlfriend (later wife), Kathy Wray, between 18 June 1986 and 11 September 1986, and twenty-five calls from the Stout residence to defendant Wray's place of business between 4 June 1986 and 29 August 1986. As further evidence, the State presented testimony of David Johnson, Cecil's boyfriend, that both he and Cecil had bought drugs from defendant Wray and defendant Wray had expressed concern that Cecil might talk.

While defendant Tucker did not testify, he presented witnesses on his behalf. One, Thomas Lee Vestal, Kathy Wray's brother, testified that in April 1988 Donna told him she had killed Cecil because Cecil had been sleeping with defendant Tucker and Tucker had gotten Cecil pregnant. Defendant Tucker thought he was the murderer, however, because he was so heavily drugged at the time. The confession was prompted by a scene on television portraying a betrayed wife drawing a gun on her husband and his lover. When Vestal commented that an adulterous spouse was not worth losing one's life over, Donna responded, "When you got the feds wrapped around you, you don't get in any trouble."

Defendant Tucker also presented the expert testimony of Dr. Billy Ray Hunter, a psychiatrist, on the effect of Dilaudid. According to Hunter, a person under the influence of this potent pain killer is generally passive and withdrawn. While an addict will experience withdrawal symptoms of nausea, vomiting, cramps, restlessness, and irritability, an addict will remain withdrawn, passive, and seemingly functional as long as the drug is available. Due to the mental cloudiness or confusion, sleepiness, and periods of short-term memory loss the drug causes, use of Dilaudid would impair the user's ability to operate machinery safely. After reviewing defendant Tucker's medical files, Hunter determined that defendant Tucker had been an addict since 1981 and was addicted around the time of the crime. Hunter also described the relationship between an addict and his source as an intense, controlling one in which the addict is "pretty much an indentured slave."

Defendant Wray testified on his own behalf. He also presented the testimony of several witnesses.

June Hall, the sister of defendant Wray and Donna Tucker, testified about two conversations with Donna in early April 1988 before Donna's arrest for Cecil's murder. During the first, Donna said she had told the police something that "was going to burn [defendant Tucker's] ass good." She also would have to serve some

time, but only a little. In the second, Donna told June she and defendant Tucker had killed Cecil, but she made no mention of any involvement of defendant Wray. June also testified that when defendant Wray was arrested on the drug charges, Donna had told her that she sold drugs to Cecil. Around 3 or 4 September 1986, Donna had asked June for money to help her make payments on a new Escort which she had bought in June 1986. The day after the car disappeared, Donna had told June it was stolen while she and defendant Tucker were at the movies and she thought her brother, Walter Wray, had the missing extra set of keys. Later, Donna told June that she and defendant Tucker had burned the car because there had been a body in it. At no point did Donna mention any involvement of defendant Wray in the burning of the car.

June also testified about a phone call from Donna from prison in which Donna told June she (Donna) would probably get twenty to twenty-five years, so she "had to do something." June further testified that Donna and defendant Wray had never gotten along, that she knew defendant Tucker had a serious drug problem, that Donna usually obtained defendant Tucker's drugs for him, and that Donna had a reputation for lying. June had never known of Donna getting Dilaudid from defendant Wray.

Lawrence Watford testified that he became acquainted with David Johnson while being held in the Randolph County jail. Johnson told him he had to kill defendant Tucker and Donna because they had killed his "wife" and baby. Johnson also told Watford he was prepared to lie under oath in order to get the people who killed his wife and child. At one time, Johnson said he thought defendant Wray was the one who killed Cecil, but later he said it was not Wray but almost surely was Donna. Watford said Johnson never mentioned buying drugs from defendant Wray; Watford was under the impression that Johnson was a drug dealer himself.

Defendant Wray's wife Kathy also testified on his behalf. According to Kathy, defendant Wray was hospitalized in August 1985 for three to four days for reconstructive surgery on his nose and sinuses. Upon his release, defendant Wray received a prescription for Dilaudid. He later kept the leftover medicine in a milk crate at Kathy's house with some of his other personal belongings which he would carry to Mid-State Welding Company.

The weekend after defendant Wray's arrest for the drug offenses he and Kathy went to the beach. There they saw Jack

Green, an attorney, who gave Wray advice on the charges. When they returned home on 1 September 1986, Cecil called. Wray and Kathy introduced Cecil to Green and Cecil also retained Green.

In September 1986 Kathy did not know Donna well, as defendant Wray and Donna did not speak to each other. When Kathy married defendant Wray in 1988, Kathy and Donna became closer, but Donna would only visit when defendant Wray was not at home. Defendant Wray began to tolerate Donna for Kathy's sake and allowed Donna to come on a family trip to Florida in April 1988 at Kathy's suggestion. Kathy testified that on the drive down, while defendant Wray was asleep in the back seat of the van, Donna told her that she and defendant Tucker had killed Cecil. Donna explained that she and defendant Tucker had been selling drugs to Cecil and that they had gone to Greensboro in response to a call from Cecil for drugs. Cecil joined the Tuckers in their car, which Donna was driving because defendant Tucker kept "nodding out." Defendant Tucker and Cecil began to argue about Cecil stealing drugs from defendant Tucker. Donna became angry because Cecil was acting "like she was [defendant Tucker's] wife." When defendant Tucker and Cecil continued to argue, Donna got out of the car, picked up something, and "knocked the shit out of [Cecil]." Donna thought Cecil was merely unconscious. She had defendant Tucker put Cecil's body in the car. Donna continued to drive because defendant Tucker was "nodding out" again. After driving awhile, Donna pulled off the road and told defendant Tucker: "[T]hrow the bitch out. Somebody will get her."

According to Kathy, Donna never mentioned anything about defendant Wray or about Cecil's being choked. While the women never discussed the incident again in detail, whenever it came up Donna always tried to blame her husband. The conversation inevitably began with Donna characteristically accusing defendant Tucker of sleeping with someone. When Donna was in jail, Kathy visited her several times. On one occasion, Donna said she had told the police and the prosecutor that she had lied, to which they had responded that she should stick to her statement or she would get the death penalty or life imprisonment. Donna told Kathy she was only twenty, too young for that, so she had to do something. Kathy did not know until defendant Wray's arrest that Donna had implicated him. Kathy had no knowledge of her husband dealing drugs.

Luanne Hicks, Kathy's roommate before Kathy married defendant Wray, testified about a conversation with Donna the day Donna had told Vestal she had killed Cecil. Hicks had been upstairs taking a bath while Donna and Vestal talked. When Hicks came downstairs, Vestal rolled his eyes and whispered to her, in reference to Donna, "I think she's crazy." After Vestal left, Donna confided to Hicks that defendant Tucker had choked a girl over a dope deal.

Defendant Wray then testified, denying any involvement in the disappearance or death of Cecil. He claimed he met David Johnson when Johnson came looking for Wray's brother, a friend from prison, and for a job as part of a parole work plan. Wray offered to help. As a result, Johnson paid more visits to Mid-State and called several times. On one of Johnson's visits, Wray met Cecil. When Johnson was taken off work-release, Wray then had contact with Johnson through Cecil. Wray denied selling drugs to Johnson or Cecil.

Wray also explained the presence of Dilaudid at Mid-State on 29 August 1986 as resulting from his nose surgery. That morning around 10:00 a.m., Cecil had stopped by to discuss Johnson's work plan. Cecil stayed about twenty minutes and used the bathroom before leaving. Around 1:00 p.m., Donna stopped by to ask if Wray had seen their mother, which Wray found to be strange because Donna had only come to Mid-State once before and because there was no reason for their mother to come by that day. Moments later the officers arrived, conducted the search, and arrested Wray. Donna left as the officers entered.

Wray testified that he had never been close to Donna and rarely saw her. In 1983 he got into a fight with the Tuckers, as a result of which he was tried for assault on a federal witness.[1] Both Tucker and Donna testified against defendant Wray on the assault charges. For years afterward, contact between Wray and the Tuckers was even more limited. He did know from family sources that Donna supplied Tucker with drugs.

Defendant Wray also testified that the first time he saw Donna after his 29 August 1986 drug arrest was at Christmas 1987 at their mother's house. After Wray heard the Tuckers arguing in

---

1. Defendant Tucker was a witness against Wray's and Donna's father on federal drug charges at the time; Tucker was placed in a federal witness protection program for a period in connection with the federal case against his father-in-law.

**STATE v. TUCKER**

[331 N.C. 12 (1992)]

the living room, Donna came into the kitchen and told Wray that Tucker had killed Cecil. When their mother later showed him Donna's letter saying Wray had nothing to do with the murder of Cecil, he was baffled because it had never occurred to him that he was involved.

### DEFENDANT WRAY'S APPEAL

[1] Wray sought to introduce statements made by defendant Tucker on 15 April 1987, 22 February 1988, and 25 February 1988. In the first, defendant Tucker stated to Agent Bryant that he could say with "absolute certainty" that his source of Dilaudid was an individual in Gastonia, that Wray was not the source, and that he and Donna did not deal drugs with Wray because neither trusted him after defendant Tucker testified against Wray's father in a federal drug case. In this statement defendant Tucker did not implicate Wray in the murder of Cecil.

On 22 February 1988, however, defendant Tucker claimed that Wray had killed Cecil. On 25 February 1988, Tucker claimed that Wray killed Cecil and the Tuckers were hired only to lure her out for Wray.

The trial court excluded these statements, as well as statements made by defendant Tucker on 12 April 1988, as hearsay and under the authority of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476 (1968). In *Bruton*, the United States Supreme Court held that at a joint trial, admission of a statement by a nontestifying codefendant that incriminated the other defendant violated that defendant's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment. *Id.* at 126, 20 L. Ed. 2d at 479. This right binds the states via the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403, 13 L. Ed. 2d 923, 926 (1965); *State v. Parrish*, 275 N.C. 69, 74, 165 S.E.2d 230, 234 (1969).

> The result is that in joint trials of defendants it is necessary to exclude extrajudicial confessions unless all portions which implicate defendants other than the declarant can be deleted without prejudice either to the State or the declarant. If such deletion is not possible, the State must choose between relinquishing the confession or trying the defendants separately. The foregoing pronouncement presupposes (1) that the confession is inadmissible as to the codefendant . . ., and (2) that the declarant will not take the stand. If the declarant can

be cross-examined, a codefendant has been accorded his right to confrontation.

*State v. Fox*, 274 N.C. 277, 291, 163 S.E.2d 492, 502 (1968).

These principles are substantially codified in N.C.G.S. § 15A-927(c). The trial court has three choices when a defendant objects to joinder due to the existence of an extrajudicial statement by a codefendant that makes reference to the objecting defendant but is not admissible as to the objecting defendant: 1) a joint trial at which the statement is not admitted; 2) a joint trial at which the statement is admitted in a sanitized form; or 3) a separate trial for the objecting defendant. N.C.G.S. § 15A-927(c) (1988).

The trial court correctly precluded admission of statements given by defendant Tucker on 12 April 1988. On that date, Tucker gave a detailed statement implicating himself, Donna, and defendant Wray. He stated that Wray hired the Tuckers to kill Cecil in exchange for $1,000 in cash and $1,000 in pills. Tucker described meeting Cecil and driving around with her as the Tuckers and Cecil looked for the hidden pills. According to Tucker, he began to have doubts about killing Cecil, but at Donna's urging he hit Cecil over the head. The next day Wray paid the Tuckers and told them how to get rid of the car. After lengthy debate and an unsuccessful attempt to "sanitize" this statement, the State withdrew its proffer. Later, the trial court ruled that other statements made by Tucker on 12 April were part of the same transaction and therefore were also inadmissible.

[2] While the 12 April 1988 statement clearly was inadmissible under *Bruton* and N.C.G.S. § 15A-927(c), the trial court erred in precluding admission of the 15 April 1987 statement. *Bruton* only applies when a confession by a nontestifying defendant is "inadmissible as to the codefendant." *Fox*, 274 N.C. at 291, 163 S.E.2d at 502; *see also* N.C.G.S. § 15A-927(c)(1) (1988). A statement is inadmissible as to a codefendant only if it is made outside his presence and incriminates him. *See State v. Bonner*, 222 N.C. 344, 345, 23 S.E.2d 45, 46 (1942); *see also State v. King*, 287 N.C. 645, 654, 215 S.E.2d 540, 550 (1975), *judgment vacated in part*, 428 U.S. 903, 49 L. Ed. 2d 1209 (1976). While the 15 April statement was made outside Wray's presence, it does not incriminate him. Indeed, it tends to exonerate him, which is why he sought to introduce it. The refusal to admit this statement deprived Wray not only

of exculpatory substantive evidence but also of evidence that contradicted testimony of the State's key witness, Donna Tucker.

Neither was the 15 April statement inadmissible as hearsay. Upon defendant Tucker's invocation of his right not to incriminate himself, the 15 April statement became admissible as a statement against penal interest by an unavailable witness. N.C.G.S. § 8C-1, Rules 804(a)(1), 804(b)(3) (1988); *State v. Singleton*, 85 N.C. App. 123, 128, 354 S.E.2d 259, 263, *disc. rev. denied*, 320 N.C. 516, 358 S.E.2d 530 (1987). If a statement "so far tend[s] to subject [the declarant] to . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true, it is admissible." N.C.G.S. § 8C-1, Rule 804(b)(3). The statement must actually subject the declarant to criminal liability. *Singleton*, 85 N.C. App. at 129, 354 S.E.2d at 263. An anonymous letter does not satisfy this element because a declarant who conceals his identity does not tend to expose himself to criminal liability. *State v. Artis*, 325 N.C. 278, 304, 384 S.E.2d 470, 484-85 (1989), *cert. granted and judgment vacated*, 494 U.S. 1023, 108 L. Ed. 2d 604, *on remand*, 327 N.C. 470, 397 S.E.2d 223 (1990), *on remand*, 329 N.C. 679, 406 S.E.2d 827 (1991). Here, however, Tucker's identity was known and his liability for various drug offenses was clear.

The statement also must be such that the declarant would understand its damaging potential. *Id.* at 305, 384 S.E.2d at 485. Some courts have held that statements made to law enforcement officers or prosecutors as part of plea bargain negotiations do not meet this element because the reasonable man in those circumstances would not believe his statement necessarily subjected him to criminal liability. *United States v. Rhodes*, 713 F.2d 463, 473 (9th Cir. 1983), *cert. denied*, 464 U.S. 1012, 78 L. Ed. 2d 715, *cert. denied sub nom. Dudley v. United States*, 465 U.S. 1038, 79 L. Ed. 2d 711 (1984); *United States v. Callahan*, 442 F. Supp. 1213, 1222 (D. Minn. 1978), *record supplemented*, 455 F. Supp. 524, *judgment rev'd on other grounds sub nom. United States v. Larson*, 596 F.2d 759 (8th Cir. 1979). While there is evidence that defendant Tucker cooperated with law enforcement officers during the spring of 1988, there is no evidence that he had entered into a relationship with the authorities as early as 15 April 1987.

In the majority of cases, the statement at issue subjects the declarant to liability for the crime(s) of which the defendant is

accused. Under our pre-Rules case law the declaration had to be one that the declarant committed the crime for which the defendant was on trial, and the admission had to be inconsistent with the guilt of the defendant. *State v. Haywood*, 295 N.C. 709, 730, 249 S.E.2d 429, 442 (1978). *Haywood* overturned the prior North Carolina practice of precluding admission of statements against penal interest as hearsay yet retained several restrictive requirements, most of which survived passage of the Rules of Evidence. *Singleton*, 85 N.C. App. at 129, 354 S.E.2d at 263; 1 Henry Brandis, Jr., *Brandis on North Carolina Evidence* § 147 at 679 (3d ed. 1988).

This Court, however, has admitted statements under Rule 804(b)(3) that subject the declarant to criminal liability for offenses other than those for which the defendant is on trial. In *State v. Levan*, 326 N.C. 155, 388 S.E.2d 429 (1990), several witnesses were permitted to testify about statements made by the victim of a murder charged against the defendant. The victim said he had shot and killed someone to whom he was sent to collect a drug debt owed to the defendant. Later, the collector was himself killed. The State tried the defendant for the murder on the theory that the defendant killed him because the defendant feared the collector would testify against him in drug cases in exchange for a deal from the State on the collection-shooting death. The Court held that the statement by the defendant's victim that he had shot one of the defendant's clients who had "cut" the defendant on a drug deal was a statement against the penal interest of the victim, admissible under Rule 804(b)(3). *Id.* at 163-64, 388 S.E.2d at 433; *see also Maugeri v. State*, 460 So. 2d 975, 976-79 (Fla. Dist. Ct. App. 1984), *cause dismissed*, 469 So. 2d 749 (1987) (statement by victim to his girlfriend, two days before his murder, that he had stolen two kilograms of cocaine from the defendant's airplane, admissible under the hearsay exception for statements against penal interest); *cf.* David W. Louissell & Christopher B. Mueller, *Federal Evidence* § 489 at 1149-52 (1980) (against-interest requirement satisfied by a third-party confession which "implicates both the declarant and the accused in *some other crime*, where the effect of the statement is to exonerate the accused in some way respecting the charged crime, as by . . . *corroborating a defense explanation* of otherwise damning circumstantial evidence") (emphasis added).

As in the cited cases, Tucker's declaration involved crimes other than those for which Wray was tried. Tucker's statement is similar to those at issue in the above cases in that it bears

on collateral but related issues in the case against Wray. In *Levan* and *Maugeri*, the statements by the victims helped explain, from the State's point of view, why the victims were killed. Though it incriminates him in drug dealing, Tucker's statement tends to corroborate Wray's testimony that Wray did not deal in drugs, that he did not have a relationship with the Tuckers, that he would not have turned to them for aid because he did not trust them or get along with them, and that he did not ask them to help with a problem witness. The statement tended to counter the State's position on important issues in the case — Wray's involvement in the drug trade, his motivation to kill Cecil, and his employment of the Tuckers to kill Cecil.

One requirement enunciated in *Haywood* which expressly carries over in the Rules is that a statement against penal interest is not admissible "unless corroborating circumstances clearly indicate the trustworthiness of the statement." N.C.G.S. § 8C-1, Rule 804(b)(3); *see Haywood*, 295 N.C. at 730, 249 S.E.2d at 442. "The circumstantial guaranty of reliability for declarations against interest is the assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." N.C.G.S. § 8C-1, Rule 804(b)(3), comment (quoting Advisory Committee's Note); *see also United States v. Harris*, 403 U.S. 573, 583, 29 L. Ed. 2d 723, 734 (1971); *Levan*, 326 N.C. at 163-64, 388 S.E.2d at 433. This aspect of Rule 804(b)(3) requires that corroborating evidence support the assumption of reliability. The evidence here provides the requisite indications of trustworthiness: 1) Tucker had been addicted for years; 2) the Tuckers had been estranged from Wray during some of those years; 3) the Tuckers had been inaccessible to Wray and his family at least during the period while Tucker was placed in a witness protection program; 4) Donna had used many sources to satisfy Tucker's drug needs; 5) Tucker had testified against Wray and Wray's father; and 6) Tucker made this statement almost a full year before he made the statements implicating Wray. While Tucker later said he received drugs from Wray on at least one occasion in part payment for Cecil's murder, the record does not reveal that Tucker ever expressly repudiated his 15 April 1987 statement that Wray was not his drug source. We conclude that Tucker's statement on 12 April 1988 is not so inconsistent with his assertion on 15 April 1987 that the assertion is untrustworthy.

**[3]** The trial court also erred in precluding admission of the 22 February and 25 February 1988 statements, in which Tucker said that Wray, not he, killed Cecil. Despite the inculpatory nature of the statements as to Wray, Wray sought to use them to support his defense that the Tuckers planned and executed the murder of Cecil without any involvement on his part, and over a period of time conspired to implicate him in order to get a deal from the State. Wray contends that the mere existence of such inconsistent statements by Tucker undermines the State's theory of the case and adds weight to his theory that the Tuckers cast about for a means of escaping punishment. Because defendant Tucker was not a witness at the trial, the February statements would have served to impeach only Donna.

As to the February statements, we hold that the trial court erroneously applied *Bruton* to Wray's prejudice by precluding him from presenting evidence in support of his defense. Further, because Wray did not offer the statements as the truth of the matters asserted, *i.e.*, that he killed Cecil or hired the Tuckers to lure her out, but rather offered them to discredit the State's theory of the case, the statements are not inadmissible hearsay. N.C.G.S. § 8C-1, Rule 801(c) (1988).

Because Wray sought to introduce rather than to exclude statements by his codefendant, *Bruton* is inapposite. The more appropriate precedents are those in which joinder of charges against codefendants, one who testifies and one who does not, leads to deprivation of the right to a fair trial because the testifying defendant is precluded from presenting exculpatory evidence. *E.g.*, *State v. Boykin*, 307 N.C. 87, 296 S.E.2d 258 (1982); *State v. Alford*, 289 N.C. 372, 222 S.E.2d 222, *vacated in part on other grounds sub nom. Carter v. North Carolina*, 429 U.S. 809, 50 L. Ed. 2d 69 (1976).

*Alford* involved a joint trial of two codefendants, Alford and Carter, for armed robbery and murder. Alford testified and presented an alibi defense, while Carter did not testify. Carter had made a pretrial statement to the authorities implicating himself and another man, Larry Waddell, in the crimes. Carter did not mention Alford in the statement, and eyewitness testimony established that there were only two perpetrators. The State did not offer the statement, apparently to avoid weakening its case against Alford. *Id.* at 387, 222 S.E.2d at 232. This Court held that because Carter could have

refused to testify on the basis of the Fifth Amendment, Alford was effectively deprived of evidence which would have corroborated his alibi testimony. *Id.* at 388, 222 S.E.2d at 232. Under the circumstances, Alford's defense was so prejudiced by the trial court's denial of his motion to sever that he was denied his rights to due process and confrontation. *Id.* at 389, 222 S.E.2d at 233; *see also Boykin*, 307 N.C. at 90-92, 296 S.E.2d at 260-61.

In *Alford* the Court relied on *Chambers v. Mississippi*, 410 U.S. 284, 35 L. Ed. 2d 297 (1973), in which the Supreme Court held that the conjunction of two errors by the trial court deprived the defendant of a fair trial. *Chambers*, 410 U.S. at 302, 35 L. Ed. 2d at 313. The first occurred when the trial court prevented the defendant from cross-examining his own witness McDonald about circumstances surrounding the signing by the witness of a written confession to the shooting for which the defendant was being tried. *Id.* at 296, 35 L. Ed. 2d at 309. The trial court also precluded, as hearsay, testimony by three witnesses that McDonald had confessed to them that he shot the victim. *Id.* at 298-302, 35 L. Ed. 2d at 310-13.

While these cases support our holding awarding Wray a new trial, they differ from this case in two ways. First, they are all pre-Rules. As such, they turn on analyses of the constitutional rights to due process and confrontation and the statutory right to a fair trial. Here, the Rules of Evidence apply. Courts do not resolve issues on a constitutional basis when they can be resolved on other grounds. *State v. Agee*, 326 N.C. 542, 546, 391 S.E.2d 171, 173 (1990); *State v. Creason*, 313 N.C. 122, 127, 326 S.E.2d 24, 27 (1985). We thus confine our reasoning and holding to the Rules of Evidence. Second, because there were then no hearsay exceptions covering these statements, this Court in *Alford* and *Boykin* was obliged to find error in the failure of the trial court to grant severance.

[4] Here, we hold that the trial court erred in precluding admission of the statements because they were either nonhearsay or admissible under a hearsay exception. The sole direct evidence against Wray was the testimony of Donna Tucker, an interested witness of highly questionable credibility. Wray's defense was that the Tuckers killed Cecil with no knowledge or involvement on his part, then sought to escape punishment by implicating him. The number of and inconsistencies in defendant Tucker's pretrial

statements not only support this theory, but could well have fatally undermined the State's theory of the case contained in the testimony of Donna Tucker. We thus cannot conclude that the error was harmless. N.C.G.S. § 15A-1443(a) (1988).

[5]   Defendant Wray also contends he should not have been convicted of a Class A or capital felony because his conviction was based solely on the uncorroborated testimony of a coconspirator, Donna. The statute under which Wray was convicted provides:

> [I]f a person who heretofore would have been guilty and punishable as an accessory before the fact is convicted of a capital felony, and the jury finds that his conviction was based solely on the uncorroborated testimony of one or more principals, coconspirators, or accessories to the crime, he shall be guilty of a Class B felony.

N.C.G.S. § 14-5.2 (1986). In a related argument, Wray challenges the trial court's instructions defining "corroboration" for purposes of this statute.

Because Wray did not object to the instructions at trial, he cannot now assign them as error. Further, the jury found that "the conviction of First Degree murder [was] *not* based solely on the uncorroborated testimony of one or more principals." (Emphasis in original.) Even assuming, however, that Wray's conviction was based solely on the uncorroborated testimony of Donna, Wray cannot show prejudice. Having received a sentence of life imprisonment, he cannot be subjected to the death penalty at his new trial. *Bullington v. Missouri*, 451 U.S. 430, 68 L. Ed. 2d 270 (1981); *State v. Silhan*, 302 N.C. 223, 270, 275 S.E.2d 450, 482 (1981). Whether he is tried, therefore, for a Class A or a Class B felony, the maximum punishment he can receive is life imprisonment.

## DEFENDANT TUCKER'S APPEAL

[6]   Tucker's appeal involves statements he made to Agent Bryant and Deputy Siwinski on 21 April 1988, which he claims were obtained in violation of his Fifth and Sixth Amendment rights and to his prejudice. We agree, and we therefore award defendant Tucker a new trial.

On 12 April, Tucker had shown Bryant and Siwinski sites in Guilford County related to the murder of Cecil. The light failed before Bryant and Siwinski were able to drive Tucker to Surry

County to show them where Cecil's body was left. As a result, Siwinski and Bryant took Tucker to Surry County on 21 April. The trial court allowed both officers to testify about what Tucker said and what he showed them while there. Bryant testified that Tucker identified both the general area where the dumping occurred and the dirt road down which the Tuckers initially had turned to dump the body. Tucker explained that the condition of this first road concerned him and Donna, so they backed out and went north, recrossing the river, to dispose of Cecil's body. Siwinski's testimony was consistent with Bryant's.

Prior to trial, Tucker filed a motion to suppress any statements made by him to law enforcement officers. During pretrial hearings, the State asserted that the only statement it intended to introduce was the one made on 12 April. At trial, however, the State began to question Agent Bryant regarding his meeting with defendant Tucker on 21 April. When Tucker objected, the trial court held a *voir dire* to determine the admissibility of the 21 April statements. It ruled that the statements were admissible, concluding that Tucker had "freely, voluntarily and understandingly waived his right to an attorney" before making the statements and that the officers did not threaten or coerce him in order to obtain the statements.

The trial court so concluded after hearing the following evidence:

On 18 April, Siwinski appeared before the grand jury which indicted Tucker for the murder of Cecil. On 19 April, Tucker turned himself in to Siwinski. On 20 April, Tucker made his first appearance, had a public defender appointed to represent him, and met with appointed counsel. During the *voir dire*, Siwinski testified that on 21 April he had Tucker brought from the jail to the sheriff's department between 8:00 and 8:30 a.m. Siwinski read Tucker his rights, then asked if he agreed to accompany him to Surry County. According to Siwinski, Tucker responded that he wanted to make a phone call first. Initially, Siwinski denied he knew Tucker was trying to call his attorney or that Tucker told him he was unsuccessful in reaching his attorney. When faced with contrary testimony from a 13 February 1989 hearing, however, Siwinski "remembered" that he knew Tucker attempted unsuccessfully to call his attorney.

Tucker gave the following testimony on *voir dire*:

He had met with his attorney, Robert O'Hale, on the evening of 20 April, following his first appearance. O'Hale told him not

to talk to anyone or go anywhere without counsel. When officers came to Tucker's cell the next morning, he thought they were taking him to his lawyer. Instead, they took him to Siwinski, who asked him to go to Surry County and read him his rights. He responded, "Well, my lawyer told me not to go with you or — and talk to anybody, unless I call him first." It was then about 8:05 a.m. Tucker did not have a card with his counsel's phone number; therefore, Siwinski escorted him to a phone booth and gave him a directory. When Tucker had trouble finding the phone number, Siwinski helped him find it. Tucker called once and let the phone ring several times, but no one answered.

When Tucker told Siwinski nobody was answering, the following exchange occurred: Siwinski said, "Well, we need to hurry, because SBI Agent Bryant has to be somewhere else and we need to get to him early." Tucker said he wanted to phone his attorney once more. Again, he was unable to reach anyone at the Public Defender's Office. When he told Siwinski, Siwinski said, "Well, what are you going to do? You're either going with me or you're not. We need to know now." Tucker responded, "Well, I'm not supposed to. Robert O'Hale told me not to." Siwinski then said:

> Well, you've swam too far up the river now to turn back . . . . It'll be rough on you, if you stop cooperating now. . . . Mr. McBryde has told you that, and I have too. . . . I told you before, if I want to fuck you, I'll tell you. But if I—I don't want you; I want Gene (defendant Wray). . . . I want you to get in the car.

After this exchange, and because of it, Tucker agreed to go with Siwinski and to sign a waiver form. Tucker believed Siwinski when Siwinski threatened him if he did not continue to cooperate. This was not the first time Siwinski had told Tucker he did not want him, but wanted Wray. Siwinski and others had told him if he cooperated the charges would be consolidated and he probably would receive only three to five years.

Of the findings of fact made by the trial court, the following are pertinent: 1) On 20 April, Tucker was taken to District Court, where Robert O'Hale was appointed to represent him; 2) O'Hale talked to Tucker later that afternoon or evening and told Tucker not to talk or go with anyone without counsel; 3) On 21 April, Siwinski met with Tucker in the Guilford County Jail Complex and stated that he wanted Tucker to go with him to Surry County;

4) On 21 April, Tucker told Siwinski what his lawyer had said; 5) Tucker tried to call his attorney twice that morning; and 6) Siwinski told Tucker they needed to hurry and "something to the effect that 'If I want you, I'll tell you. I want Gene.'"

Rather than challenging the trial court's conclusions of law that the resulting statement was not involuntary or due to threats or promises, Tucker argues that the statement was elicited after his Sixth Amendment right to counsel had attached and he had invoked his right to counsel under the Fifth Amendment. Tucker's Sixth Amendment right to counsel clearly had attached prior to his meeting with Siwinski on the morning of 21 April. This right attaches upon the commencement of criminal judicial proceedings against a defendant, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 688-89, 32 L. Ed. 2d 411, 417 (1972); *see also Michigan v. Harvey*, 494 U.S. 344, 348, 108 L. Ed. 2d 293, 301-02 (1990); *Michigan v. Jackson*, 475 U.S. 625, 629-30, 89 L. Ed. 2d 631, 638 (1986); *Brewer v. Williams*, 430 U.S. 387, 398, 51 L. Ed. 2d 424, 436, *reh'g denied*, 431 U.S. 925, 53 L. Ed. 2d 240 (1977); *State v. Nations*, 319 N.C. 318, 324, 354 S.E.2d 510, 513 (1987). Here, the right attached during Tucker's initial appearance, because at that point the State's position against him had solidified with respect to the charge of murder. *McNeil v. Wisconsin*, --- U.S. ---, 115 L. Ed. 2d 158, 168 (1991).

Equally clearly, Tucker invoked the right when he requested and received appointment of counsel at his initial appearance. *See Patterson v. Illinois*, 487 U.S. 285, 290-91, 101 L. Ed. 2d 261, 271 (1988). Thus, his 21 April statements were admissible only if he subsequently waived his asserted right.

To determine whether Tucker validly waived the right, we must ask: (1) whether the 21 April interview was police-initiated— *Jackson*, 475 U.S. at 636, 89 L. Ed. 2d at 642; and (2) whether Tucker knowingly and intelligently waived the right. *Patterson*, 487 U.S. at 293, 101 L. Ed. 2d at 272; *Oregon v. Bradshaw*, 462 U.S. 1039, 1044-46, 77 L. Ed. 2d 405, 411-13 (1983); *Nations*, 319 N.C. at 326-27, 354 S.E.2d at 515; *State v. Robey*, 91 N.C. App. 198, 202-03, 371 S.E.2d 711, 713-14 (1988). If the law enforcement authorities, not Tucker, initiated the 21 April interrogation, we need not proceed to the second question because "any waiver of the defendant's right to counsel for that police-initiated interroga-

tion is invalid." *Jackson*, 475 U.S. at 636, 89 L. Ed. 2d at 642; *see also Robey*, 91 N.C. App. at 203, 371 S.E.2d at 714. The question, therefore, is whether Siwinski or defendant Tucker initiated the conversation that resulted in the incriminating statements.

The trial court found that Siwinski met with Tucker and asked Tucker to go to Surry County with him. The evidence on *voir dire*, from both Tucker and the State, was that Siwinski had Tucker brought to him. Tucker did not request to see Siwinski; rather, Tucker thought he was going to see his attorney. The findings and evidence thus establish without contradiction that the interview was police-initiated. Therefore, the waiver executed by Tucker is invalid, despite Siwinski's informing Tucker of his rights and Tucker's ultimately acquiescing in Siwinski's "request" to accompany him to Surry County. *Jackson*, 475 U.S. at 635-36, 89 L. Ed. 2d at 641-42.

Language in *Patterson*, 487 U.S. at 296-98, 101 L. Ed. 2d at 275-76, suggesting that a proper admonishment of a defendant's Miranda rights will suffice to show a valid waiver is limited to the facts of that case. There, the defendant had not asserted his Sixth Amendment right to counsel, had not invoked his Fifth Amendment right to counsel, had not been appointed counsel, and had not made his first appearance. The Court distinguished the *Michigan v. Jackson* situation, in which the defendant had been arraigned and counsel had been appointed. *Id.* at 296 n. 9, 101 L. Ed. 2d at 275 n. 9. *Jackson*, rather than *Patterson*, is the controlling precedent here. Thus, the waiver Tucker executed during the interrogation initiated by Siwinski is invalid and his statements were obtained in violation of his Sixth Amendment right to counsel.

Further, the statements were inadmissible under the prophylactic rules established to safeguard the Fifth Amendment right to counsel. In *McNeil v. Wisconsin*, the Supreme Court rejected the argument that a defendant's assertion of his Sixth Amendment right to counsel automatically results in an invocation of the right to counsel for Fifth Amendment purposes. *McNeil*, --- U.S. at ---, 115 L. Ed. 2d at 166-69. For a request for counsel at a judicial proceeding to serve as a Fifth Amendment invocation as well, there must be an indication of a desire to deal with the police only through counsel, not merely the expression of a desire to have counsel present at formal proceedings. *Id.* at ---, 115 L. Ed. 2d at 169. Here, however, Tucker's assertions and the cir-

cumstances on the morning of 21 April, rather than his request for counsel at his first appearance, determine the sufficiency of his invocation of the right to counsel for Fifth Amendment purposes.

After Siwinski asked Tucker if he would go to Surry County, Tucker said his attorney had told him not to talk to anyone or go anywhere without counsel. Tucker asked to, and did, call his attorney twice. Siwinski knew whom Tucker was trying to reach and that Tucker was not successful. If a defendant "indicates in any manner . . . that he wishes to consult with an attorney before speaking there can be no questioning." *Miranda v. Arizona*, 384 U.S. 436, 444-45, 16 L. Ed. 2d 694, 707 (1966). This Court recently relied on this language in holding that a defendant invoked the right to counsel when she asked if she needed an attorney and her friend looked up the defendant's attorney's phone number, only to be dissuaded by the officers from calling him. *State v. Torres*, 330 N.C. 517, 412 S.E.2d 20 (1992). In informing the authorities of his desire to call his attorney and in attempting to do so, Tucker, too, invoked his Fifth Amendment right to counsel. *See United States v. Porter*, 764 F.2d 1, 6-7 (1st Cir. 1985) (suspect's attempt to telephone his attorney in presence of DEA agent constituted invocation of right to counsel); *Silva v. Estelle*, 672 F.2d 457, 458 (5th Cir. 1982) (defendant's request to call a lawyer, made to arraignment magistrate, "can only be construed" as exercise of right to counsel); *United States v. Lilla*, 534 F. Supp. 1247, 1279 (N.D.N.Y. 1982), *on subsequent appeal*, 699 F.2d 99 (2d Cir. 1983) (suspect's request to his mother to call attorney, made in the presence of arresting officers, invoked right to counsel); *Gorel v. United States*, 531 F. Supp. 368, 371 (S.D. Tex. 1981) (recognizing that if suspect's request to his wife to telephone attorney had been attempt to obtain present counsel, suspect's Fifth Amendment rights would have been violated).

Because Tucker invoked his Fifth Amendment right to counsel during custodial interrogation, he was not subject to further police interrogation until his attorney was made available unless he himself initiated subsequent communication with Siwinski. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 68 L. Ed. 2d 378, 386, *reh'g denied*, 452 U.S. 973, 69 L. Ed. 2d 984 (1981). Under *Edwards*, a valid waiver of the invoked right cannot be established merely by showing that the defendant responded to further police-initiated custodial interrogation, even if read his rights. *Id.; see also Smith v. Illinois*, 469 U.S. 91, 98-100, 83 L. Ed. 2d 488, 496 (1984). A valid waiver

can only occur if the defendant reinitiates the conversation and the waiver was knowing and intelligent. *Bradshaw*, 462 U.S. at 1044-46, 77 L. Ed. 2d at 411-13. Unless defendant initiated the contact, we do not even consider whether any waiver was knowing and intelligent. *Id.*

Siwinski's interrogation of Tucker clearly violated *Edwards* in that Siwinski continued to pressure and question Tucker after Tucker attempted to call his attorney. Siwinski engaged in the very conduct *Edwards* proscribes. *See Minnick v. Mississippi*, 498 U.S. ---, ---, 112 L. Ed. 2d 489, 496 (1990); *Harvey*, 494 U.S. at ---, 108 L. Ed. 2d at 302 (1990). Thus, Tucker's 21 April statement was inadmissible.

The State contends that Tucker's Fifth Amendment invocation was a limited invocation only to call his attorney and that the interrogating officer respected the limited invocation by stopping his interrogation and even aiding Tucker in calling his attorney. It relies on *Connecticut v. Barrett*, 479 U.S. 523, 93 L. Ed. 2d 920 (1987) and *Griffin v. Lynaugh*, 823 F.2d 856 (5th Cir. 1987). In *Barrett,* the Supreme Court held that an oral statement by a defendant, who said he would not make a written statement without his attorney present but had "no problem" talking about the offense charged, was admissible. *Barrett*, 479 U.S. at 527-30, 93 L. Ed. 2d at 927-28. In *Griffin*, the Fifth Circuit held that the defendant's request to talk to his attorney was a limited, unambiguous request to do just that. *Griffin*, 823 F.2d at 863. Upon the defendant's request the police stopped the interrogation, aided the defendant in calling his attorney, and left the defendant alone while he talked with the attorney on the telephone. Upon reentering the interrogation room and learning from the defendant that the attorney had declined to represent him, the interrogating officers asked the defendant if he wanted to call another attorney, to which the defendant responded in the negative. *Id.*

Unlike the defendants in those cases, Tucker did not make an invocation limited merely to calling his attorney or declining to make only one kind of statement. Tucker prefaced his two attempts to call his attorney with the statement that the attorney had told him not to talk to anyone or go anywhere without calling him first. When he failed to reach the attorney a second time, Tucker repeated that he was not supposed to go with Siwinski. Even interpreting Tucker's statements narrowly, which is counter

to authority,[2] we would have to conclude that Siwinski did not honor Tucker's request. At a minimum, Tucker's communication conveyed an intent to make actual contact with his attorney to see what he advised. Finally, unlike in *Griffin*, where the court noted that there was no overreaching by the police, Siwinski's conduct here clearly violated the proscriptions of *Edwards*. *Griffin*, 823 F.2d at 863.

The State further argues that Tucker's Sixth Amendment challenge is barred because he failed to assert it at trial. According to the State, the basis of Tucker's objection at trial was that "there was no proper waiver of rights." The State contends that because Tucker did not argue *Michigan v. Jackson* at trial, he cannot argue it on appeal. *See State v. Robbins*, 319 N.C. 465, 495-96, 356 S.E.2d 279, 297-98, *cert. denied*, 484 U.S. 918, 98 L. Ed. 2d 226 (1987); *State v. Hunter*, 305 N.C. 106, 112-13, 286 S.E.2d 535, 538-39 (1982).

While Tucker argued at trial that the waiver was signed under duress, he also argued that the statement was obtained in violation of his Sixth Amendment rights after he had received appointed counsel. Specifically, Tucker's attorney argued that the waiver was signed under duress

> and in the face of his [Tucker's] clearly announced desire to communicate, and efforts, not just statements, but efforts, along with Mr. Siwinski's cooperation, to talk with his attorney. These statements are not admissible. They are obtained in violation of constitutional guarantees and the announced right of the defendant and *exercise of his Sixth Amendment rights* to have the assistance of counsel in this matter, *counsel that had already been appointed.*

(Emphasis added.) Tucker thus clearly argued at trial that the statement was obtained in violation of his attached and invoked Sixth Amendment right to counsel. This Court, therefore, properly may consider and determine the validity of his Sixth Amendment argument. *See Hunter*, 305 N.C. at 112, 286 S.E.2d at 539.

Because the error in admitting Tucker's statement was of constitutional dimension, the State must show that it was harmless

---

2. Courts should indulge every reasonable presumption against waiver of fundamental constitutional rights, and doubts must be resolved in favor of protecting the constitutional claim. *Jackson*, 475 U.S. at 633, 89 L. Ed. 2d at 640.

beyond a reasonable doubt. N.C.G.S. § 15A-1443(b) (1988); *Chapman v. California*, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710-11, *reh'g denied*, 386 U.S. 987, 18 L. Ed. 2d 241 (1967). It argues that because evidence that Tucker remembered the "general area" in which he and Donna disposed of Cecil's body was not inconsistent with Tucker's defense at trial, any error was harmless. While Tucker contended that he was too drugged to have killed Cecil, he never denied being with Donna on the night of the murder. The State argues that, in fact, the officers' testimony that Tucker could not remember the exact spot of the dumping aided Tucker's defense of "mental cloudiness."

While the officers testified that Tucker could not locate the exact spot along the wooded bank of the river that ultimately became the disposal site, they also testified that Tucker remembered crossing the river, choosing a dirt road, driving down it, rejecting it, recrossing the river, and disposing of the body. Evidence that Tucker could remember such details of an evening a year and a half before the statement renders his defense considerably less credible. Such evidence may well have caused the jury to reject his evidence of mental cloudiness and apathy at the time Cecil was choked. We thus cannot conclude beyond a reasonable doubt that the error in admitting the statement was harmless.

In summary, the trial court erred, to defendant Wray's prejudice, in excluding the 15 April 1987 and the 22 and 25 February 1988 statements. It also erred, to defendant Tucker's prejudice, in admitting the 21 April 1988 statement. We therefore award both defendants a new trial.

Defendant Wray's appeal: New trial.

Defendant Tucker's appeal: New trial.

Justice LAKE did not participate in the consideration or decision of this case.